[Crim. No. 7450.   In Bank.   March 31, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. IVA KROE-
GER and RALPH KROEGER, Defendants and Appel-
lants.

238

Timothy Abel, under appointment by the Supreme Court, and Emmet F. Hagerty for Defendants and Appellants.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., Deputy Attorney General, Thomas C. Lynch, District Attorney, and Francis W. Mayer, Assistant District Attorney, for Plaintiff and Respondent.

GIBSON, C. J.—Iva Kroeger and her husband, Ralph, were indicted for the murders of Mildred and Jay Arneson. Defendants pleaded not guilty, and Iva entered a further plea of not guilty by reason of insanity. The jury found defendants guilty of first degree murder on each of the counts, determined that Iva was sane when the offenses were committed, and fixed the punishment of both defendants at death. Their motions for a new trial and Iva's motion for modification of the penalty were denied, but the court reduced Ralph's punishment to life imprisonment. Iva's appeal comes before us automatically under subdivision (b) of

section 1239 of the Penal Code, and it has been consolidated with an appeal taken by Ralph.

In the autumn of 1961 the victims were living in Santa Rosa, where Mildred Arneson, then 58 years of age, owned and operated the Rose City Motor Court. Jay Arneson, who was about 10 years older and from whom she had been divorced in 1958, suffered from Parkinson's disease in an advanced stage and resided at the motor court. Early in November Iva and Ralph Kroeger, finding themselves in financial difficulties, left their home in San Francisco and came to Santa Rosa, telling friends that they wanted to avoid creditors. They registered at the Blue Bonnet Motel under the assumed names of Eva and Ralph Long, which they continued to use during the months that followed. The Blue Bonnet Motel was located across the street from the Rose City Motor Court, and, sometime before the middle of December, Iva became acquainted with Mrs. Arneson. The Kroegers, like Mr. Arneson, were Rosicrucians.

On or about December 10, 1961, Iva talked to the owner of the Blue Bonnet about purchasing the Rose City Motor Court, stating she had received $144,000 in settlement of an accident claim. On December 14 Mrs. Arneson wrote to her mother that she was going on a trip to Brazil with a Rosicrucian woman, that they would start in a few days, drive to San Diego, and leave the car there, and that the woman, who had received an accident settlement of $100,000, would pay Mrs. Arneson's round-trip air fare to Brazil, and would lend her $10,000 and "take the Rose City Court as security." Mrs. Arneson purchased $1,550 in traveler's checks and made preparations to leave the country.

On December 15 Mrs. Arneson had a deed notarized which transferred her motor court to "Mrs. Eva Long," and on the same day Mrs. Arneson and Iva left Santa Rosa in the former's automobile. Iva told the man who helped them load the car that Mrs. Arneson was going to San Francisco to make arrangements for her trip. That evening two of Mrs. Arneson's traveler's checks totaling $120 were cashed at a San Francisco department store, and $100 was paid on an account the Kroegers had there. The next day Iva and Mrs. Arneson's automobile were back in Santa Rosa, but Mrs. Arneson did not return with her.

Immediately on her return to Santa Rosa, Iva told several persons that she had bought the Rose City Motor Court as well as Mrs. Arneson's car. The Kroegers began to operate

the motor court, Iva collected the rents, and Ralph did a considerable amount of painting and decorating. On December 17, Iva ordered Mrs. Arneson's belongings removed from her bedroom, and Ralph burned them. Within a week the remaining traveler's checks Mrs. Arneson had purchased were used for various purposes, including a payment on a loan to the Kroegers. Although all the checks so used were signed with Mrs. Arneson's name, none of the signatures was hers. Iva was seen signing Mrs. Arneson's name to some of the checks, and she identified herself as Mrs. Arneson in using others. On January 3, 1962, Iva recorded the deed which Mrs. Arneson had executed in her favor. Iva, holding herself out as the owner, borrowed substantial sums of money from two banks, and a promissory note given to one of the banks was signed by Ralph and Iva under their assumed names.

Early in January, Mrs. Arneson's sister, Beatrice Brunn, who was told that the telephone at the Rose City Motor Court had been disconnected when she tried to call that number, asked the Santa Rosa Police Department to investigate. An officer gave Iva the sister's name to call, and on that day the sister received a telephone call from a "Mrs. Long." The caller said, among other things, that Mrs. Arneson had gone on a trip to South America on December 16 and had left her in charge of Mr. Arneson and the motor court, which had been sold, that she did not know who the buyer was, and that there was no need to worry because she had received a card from Mrs. Arneson mailed in Mexico.

In the latter part of January Iva told Walter Hughes, who was living at the Rose City Motor Court, that she was having some plumbing work done in her home in San Francisco and asked him to dig a hole there for her 4 feet long, 4 feet wide, and 4 feet deep. He agreed and drove to San Francisco with Iva, a woman named Penny Mills, and Mr. Arneson. When they arrived at the Kroeger home after dark, Iva asked Hughes to move some boxes of dirt out of the garage, located in the basement. The floor of the garage was made of smooth concrete except for a rough area which Miss Mills noticed near a post in the center of the garage. At the direction of Iva, Hughes dug a hole in a corner of the garage, working about two hours. He and Miss Mills then drove with Iva and Mr. Arneson to a hospital, where he and Iva helped Mr. Arneson to the hospital door. Iva took Mr. Arneson inside and returned to say that Mr. Arneson would be detained a

little longer than she had anticipated and that she would wait for the doctor. She told Hughes and Miss Mills to take the car and go back to Santa Rosa. Hughes saw Iva in Santa Rosa the next day, but never saw Mr. Arneson again. Mr. Arneson's doctor testified that he did not treat him after September 1961, and records of the hospital showed that Mr. Arneson had not been a patient there after that time.

On February 12 a Red Cross worker made inquiries about Mr. Arneson at the Rose City Motor Court. Iva said, in the presence of Ralph, that about three weeks earlier at 1 a.m., Mrs. Arneson had come in a white Cadillac with a Mr. Dillon (Mrs. Arneson had previously been married to a man named Bill Dillon) and that they had taken Mr. Arneson away either to a hospital in San Francisco or to Brazil.

The following day, Mrs. Arneson's mother, who lived in Yakima, Washington, received a telephone call from a woman who identified herself as Erma Long. Among the things the woman said were that she did not know where Mrs. Arneson was, that she might be in Mexico or Brazil, and that she had come to get Mr. Arneson in a white Cadillac about 2 a.m. on January 19 with a tall, fair man named Bill Dillon. The mother said that Bill Dillon was dark, and the woman replied that Mr. Arneson identified the man as Bill Dillon and that he ought to know. The woman asked the mother if she thought some man had ''got ahold of'' Mrs. Arneson and ''did her in.'' The mother said she thought the new owner of the motor court had harmed Mrs. Arneson, and the caller retorted that she was the new owner and was a respectable woman. The owner of the Blue Bonnet Motel testified that Iva had told him that she had spent $9.00 in telephoning Mrs. Arneson's mother.

Within a few weeks after the telephone call Mrs. Arneson's mother and sister respectively received a letter and a telegram purporting to be from Mrs. Arneson and bearing the signature ''Mildred.'' Ordinarily, in writing to her family Mrs. Arneson signed her name as ''Mil.'' The letter received by the mother was written on a typewriter Iva had borrowed from a tenant at the Rose City Motor Court. The telegram was addressed to the sister as ''Beatrice Brown'' rather than ''Brunn.'' (When the police officer gave Iva the sister's name to call in January, he wrote the surname as ''Brown.'') The sender of the telegram used a pay telephone in the vicinity of Salinas, and Iva was in that area at the

time the telegram was sent and made a call from a telephone booth.

In the last week of February, Iva and a woman named Inez Willets went to the Kroeger home in San Francisco and entered the garage, in a corner of which Miss Willets saw a square pile of dirt about a foot higher than the floor. They made another visit to San Francisco early in March, at which time Iva had Miss Willets buy some sacks of cement for her, waiting in the car while the purchase was made. Iva moved the sacks, each weighing about 90 pounds, from the car into the garage at the Kroeger home and said that "Mr. Long" would come down in a few days and help "the old man" fix the basement. About a week later Iva was with Miss Willets in Santa Rosa and asked her to wait until Ralph got back from "the City." Ralph finally came in, and Iva asked him, "Well, did you get the old man fixed up?" He answered, "Yes."

In April Iva and Ralph employed a contractor, Francis Kennison, to cut a door through a partition in their basement in San Francisco, and he noticed that the floor of the garage was made of greenish cement except for two rough, white patches, one in a corner and the other near a post. The Kroegers told him that the patches were there because those parts of the floor had been "dug out" when "the plumbing had plugged up." After he started his work the Kroegers asked him to make a new cement floor over the existing one. He suggested that it would be necessary to remove the old cement, and they insisted they did not want him to do so. When the time came to pour the new floor, Kennison picked up a sledgehammer and began to break some of the old cement. The Kroegers angrily stopped him and said they did not want the concrete broken. After the new floor had been poured, the Kroegers hired Kennison to install a wooden floor over it. Within a few days Ralph resumed working in San Francisco as a hod carrier, employment he had left in November of 1961.

In May, Iva advertised the Rose City Motor Court for sale at a price of $72,000. Later that month she had an altercation with a man in Santa Rosa during which she drew a gun, and a warrant for her arrest was issued but she could not be found during the several weeks that followed. The police, in the course of investigating the connection of the Kroegers with the disappearance of the Arnesons, went to the Kroeger home in San Francisco on August 20 and dug in the garage. They found Mr. Arneson's body buried in a corner where the

old cement floor had been roughly patched, and Mrs. Arneson's body in a grave near a post in the center of the garage. Both had died of strangulation.

Before and after the bodies were found the authorities on several occasions questioned Ralph, who was living in the house in San Francisco during the summer. He denied that he was at home on the day the new cement floor was poured in the basement and said that he knew nothing about the patches in the old cement, that his wife had told him about having a hole dug in the corner for a garbage disposal, but that he had never noticed a patch near the center of the garage.

Iva, who was in San Francisco about the time the bodies were discovered, fled from the area and was arrested on September 10, 1962, in San Diego, where she was using the name "Julia Schmidt."

Both defendants testified, claiming to be innocent and denying most of the incriminating evidence introduced against them.

At the trial on the issue of Iva's sanity when the offenses were committed, two court-appointed psychiatrists who examined her testified that in their opinion she was then sane.

### Appeal of Iva Kroeger

The evidence is clearly sufficient to support the findings that Iva was guilty and that she was sane when the offenses were committed, and there is no claim to the contrary. ▮ It is contended, however, that the court erred in not holding a hearing to determine her sanity as of the time of the trial.

The lengthy trial was marked by much disruptive and erratic conduct by Iva which started during the selection of the jury, increased in frequency as time went on, and included several hundred comments and outbursts. It is impractical to relate in this opinion all such occurrences, and we shall mention only a few as examples. Her most bizarre behavior began about a month after the trial commenced. She made statements purporting to indicate a belief that the reason she was appearing in court was to obtain custody of her "babies." Her conduct also included the singing of songs while on the witness stand and the making of repeated statements that she was the mother of God and that Ralph was her father. Uncontradicted psychiatric testimony was introduced at the guilt trial that Iva was a cunning and diabolical liar, that her conduct in court did not show insanity, and that she was

feigning insanity and acting in the manner she thought a mentally disordered person would act.

■ Where prior to judgment a doubt arises as to the present sanity of a defendant, that is, as to whether he is able to understand the nature and purpose of the proceedings taken against him and to conduct his own defense in a rational manner, a hearing must be had to determine that question, but whether the doubt exists is a matter resting within the discretion of the trial judge, and the lack of a hearing will not be held to constitute error on appeal unless such a doubt may be said to appear as a matter of law. (Pen. Code, § 1368; *People* v. *Merkouris*, 52 Cal.2d 672, 678-679 [344 P.2d 1].) ■ In the light of the record before us, the trial court cannot properly be said to have abused its discretion in determining that Iva was merely feigning mental illness in the hope of influencing the jury and that there was no need for a hearing.

■ Another contention is that Iva was denied independent representation by counsel of her own choice. She was arraigned on September 14, 1962, and Mr. Emmet Hagerty appeared with her and Ralph and said he represented both defendants.[1] Iva did not object or demand to be represented by another attorney. On several other occasions prior to commencement of trial, including the time when the pleas of defendants were entered, Mr. Hagerty appeared and acted for both defendants without any objection by Iva, and in at least one instance Iva referred to Mr. Hagerty as ''my attorney.'' The selection of the jury began on January 14, 1963, at which time the court told the prospective jurors, without objection by Iva, that Mr. Hagerty was representing both defendants.

On February 13, after the trial had been in progress for nearly a month, Iva testified on direct examination conducted by Mr. Hagerty without objecting to his representing her, but, when the examination was resumed the following morning, she said, ''You're his lawyer, not mine. I don't have any.'' Later, addressing Mr. Hagerty, she said, ''Just take care of Ralph. You are his lawyer and I haven't any, and I am on my own. I don't see why I'm here in the first place.'' During the trial on the issue of sanity at the time the offenses were committed, she frequently interrupted the proceedings to make statements such as, ''I have no attorney. I wish to

---

[1]Iva is represented on appeal by Mr. Timothy Abel, appointed by this court. Ralph is represented by Mr. Hagerty.

speak to counsel of my own, which I have never been allowed to. ... I am entitled to an attorney of my own choice, and I'm being denied that. . . .'' Following these last outbursts Mr. Hagerty, out of the presence of the jury, asked the court to decide whether he should withdraw as Iva's attorney or continue to represent her, and the court instructed him to continue as her attorney.

There is no sound basis for concluding that there was an infringement of Iva's right to counsel. She was ably represented by Mr. Hagerty, who was exceedingly patient in dealing with many difficult situations caused by her behavior. The court was justified in determining that her demand for a change of counsel was not made in good faith but was merely a part of her disruptive course of conduct and that there was no good reason for a change at such a late stage of the proceedings.

One of the grounds upon which a reversal is urged concerns the admonition given by the court to the jury with respect to publicity in communication media. The jurors were told that they were not to read any newspaper articles concerning the case but that they could watch television and listen to the radio unless instructed to the contrary on a particular day. It is not claimed that Iva was prejudiced by the television and radio coverage of her own trial; her contention is that she was prejudiced because the court did not prohibit the jurors from following the publicity given to the trial in another first degree murder case, *People* v. *DeKaplany* (Santa Clara Superior Court, No. 38241). It is asserted that newspaper stories (which are unspecified) reported that the jurors in the *DeKaplany* case received threats because they had not returned a death verdict and that these reports improperly influenced the jurors in the present case. There are neither affidavits nor other evidence that the jurors in this case were influenced by the publicity accorded the *DeKaplany* trial or that they even read or listened to that publicity. In such circumstances the contention must be rejected. (Cf. *People* v. *Wayne,* 41 Cal.2d 814, 832 [264 P.2d 547] [overruled on another point in *People* v. *Snyder,* 50 Cal.2d 190, 197 [324 P.2d 1]].)

A contention that Iva was compelled to testify in violation of her privilege against self-incrimination is based on statements of the court taken out of context. An examination of the relevant portions of the transcript shows that, notwithstanding Iva's disruptive conduct, both the court and

Mr. Hagerty were careful to inform her of her right not to testify, and diligent in protecting that right. The statements complained of were in reality nothing more than an effort to preserve order and to have Iva decide, without undue delay in the proceedings, whether or not she would testify.

It was not error to admit into evidence telephone calls made by the person identifying herself as Mrs. Long, since the evidence was clearly sufficient to show that they were in fact made by Iva. Likewise, the evidence was clearly sufficient to show that the letter to Mrs. Arneson's mother and the telegram to her sister were sent by Iva. █ Nor was it error to admit evidence of the letter written by Mrs. Arneson to her mother on December 14, 1961, and of a conversation in which Mrs. Arneson told the bank teller from whom she purchased the traveler's checks that she was going on a trip to South America. This evidence was received for the purpose of showing Mrs. Arneson's intent as to the future and was admissible under the rule that a declaration of intent to do an act may be shown if it is relevant to an issue in the case and the declarant is dead. (*People* v. *Alcalde*, 24 Cal.2d 177, 187 [148 P.2d 627]; *People* v. *Watson*, 198 Cal.App.2d 707, 721 [18 Cal.Rptr. 234].)

█ Iva claims that Ralph was permitted to testify in violation of her privilege as a wife against disclosure by her husband of confidential communications. However, no objection was made on this ground, and a spouse's privilege, if it is to be relied upon, must be raised at the trial. (*People* v. *Singh,* 182 Cal. 457, 482-484 [188 P. 987]; *People* v. *Odmann,* 160 Cal.App.2d 693, 696 [325 P.2d 495].)

█ Two members of the press were called by the prosecution as rebuttal witnesses to impeach Iva's testimony as to what she had told them after her arrest. An objection was made upon the ground that they had been present during the trial although the court had ordered the exclusion of all witnesses from the courtroom. It does not appear, however, that their role as witnesses could have been anticipated when the exclusionary order was made. Whether an exception to such an order should be made rests within the sound discretion of the trial court (cf. *People* v. *Ketchel,* 59 Cal.2d 503, 527-528 [30 Cal.Rptr. 538, 381 P.2d 394]), and there was no abuse of discretion here.

The record does not support contentions that Iva was denied a fair trial because, assertedly, the prosecutor impeded discovery, a police officer deliberately destroyed notes of con-

versations with Ralph, and the jury was allowed to view the basement of the Kroeger home before the judge arrived on the scene. Although it is claimed that the prosecutor, notwithstanding an order to produce, failed to come forth with all relevant material at once and forced the defense to make repeated requests for certain items of evidence, nothing in the record is cited in support of this assertion, and there is no claim that every item of evidence desired was not produced in sufficient time to permit effective presentation of the defense. The police officer who discarded the notes of conversations with Ralph testified that they were incorporated into the police report, and there is no claim that this was not the case or that the report was not made available to the defense. There is nothing in the record to indicate that the judge was not present at all times during the jury's view of the Kroeger home, and the assertion to the contrary is admittedly based only on unspecified newspaper accounts.

Other contentions made by Iva are entirely devoid of merit and need not be discussed.

The judgment against Iva must be affirmed so far as concerns the issue of guilt. ■ A reversal, however, is necessary with respect to the penalty in view of error committed during the trial on that issue. Instructions were given by the court and arguments made by the prosecutor of the type condemned in *People* v. *Morse,* 60 Cal.2d 631, 636 et seq. [36 Cal.Rptr. 201, 388 P.2d 33], which was decided while this case was pending on appeal. The prosecutor said that the jury would be instructed that persons sentenced to life imprisonment have the right to parole after serving a minimum of seven years but that he wanted to be completely honest and that, even though this was the law, he did not think either of the defendants would be released until they had served a number of years more than seven because of the circumstances of the case. The court told the jury that in choosing the penalty it might consider that under the law a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the Governor, a trial judge may also reduce the the penalty from death to life imprisonment, and a person sentenced to life imprisonment may become eligible for parole; that it was proper for the jury to know that eligibility for parole would occur after seven years; that whether or not a parole is granted is within the discretion of the Adult Authority. The court further stated that the law regarding parole did not mean that

these defendants would be released in seven years but that their cases could not be considered by the board until seven years had elapsed and that the board would then consider the various circumstances for the first time and either fix terms or make no recommendation and thereafter review the case every year or two. As was held in *People* v. *Hines, ante,* p. 164 [37 Cal.Rptr. 622, 390 P.2d 398], any substantial error in a penalty trial is prejudicial, and such error is committed in a case where, as here, there is a substantial deviation from the standards established in *Morse.*

### Appeal of Ralph Kroeger

The evidence is sufficient to support the judgment against Ralph, and he makes no contention to the contrary. ▇ He argues, however, that it is reasonable to believe he would have received a different verdict had the case been tried in the usual tranquil atmosphere of the courtroom, but that Iva's misconduct during the trial so inflamed the jury that it returned its verdict against him out of passion and bias. It is not claimed that any particular conduct of Iva was directed against Ralph or had the effect of harming him in the eyes of the jury but only that her conduct as a whole had such an effect.

Ralph is not in a position to complain since he at no time made a motion for a separate trial, for a declaration of a mistrial as to him, or for any other protective action by the court. If such a motion were not a prerequisite to raising the matter on appeal, a defendant who believes himself injured by the behavior of his codefendant would be free to keep silent and hold the point in reserve in the event the verdict as to him should prove unfavorable.

The arguments made and the instructions given at the penalty trial which were contrary to our decision in *People* v. *Morse, supra,* 60 Cal.2d 631, do not, of course, require a reversal as to Ralph, since his punishment was reduced to life imprisonment by the trial court.

The judgment against Iva Kroeger is reversed as to the penalty but is affirmed in all other respects. The judgment against Ralph Kroeger is affirmed.

Traynor, J., Peters, J., Tobriner, J., and Peek, J., concurred.

SCHAUER, J.—Obedient to the mandate of article VI, section 4½, of the California Constitution I have made "an

examination of the entire cause, including the evidence,'' and am of the opinion that it is not reasonably probable that a result more favorable to defendant Iva Kroeger would have been reached in the absence of error committed on the penalty phase.

Accordingly, on the record in this case, and for all the reasons explained and documented in my concurring and dissenting opinion in *People* v. *Hines* (1964) *ante,* p. 175 [37 Cal.Rptr. 622, 390 P.2d 398], I dissent from the judgment of reversal and would affirm in its entirety each of the judgments of the trial court.

McComb, J., concurred.