[No. G043313. Fourth Dist., Div. Three. Apr. 12, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL CRAIG MURDOCH, Defendant and Appellant.

COUNSEL

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Gil Gonzalez, Vincent P. LaPietra and Tami Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**MOORE, J.**—Criminal proceedings against defendant Michael Craig Murdoch were suspended pursuant to Penal Code[1] section 1368 and doctors

---

[1] All statutory references are to the Penal Code unless otherwise stated.

were appointed to examine his mental competence. The doctors found defendant suffered from a serious or severe mental illness and was presently competent due to the medication he had been given, but had since refused to take. Both expressed the opinion defendant could decompensate and become incompetent if he continued to refuse medication. Relying upon the evaluations, the court found defendant was not incompetent and reinstated criminal proceedings. Slightly more than two months later, the court granted defendant's motion to represent himself, and relieved the public defender.

Prior to the taking of evidence at trial, defendant told the court his defense to the felony assault charges: the victim is not a human being. According to defendant, the victim lacked shoulder blades, which "are symbolic of angelic beings." Defendant asked the victim one question on cross-examination: "Can you shrug your shoulders like this?" We find the court should have suspended the criminal proceeding and instituted proceedings pursuant to section 1368. Accordingly, we reverse.

# I

## FACTS

On August 4, 2009, the district attorney filed a felony complaint charging defendant with one count each of assault with a deadly weapon (§ 245, subd. (a)(1)) and battery with serious bodily injury (§ 243, subd. (d)). The court arraigned defendant that day and appointed the public defender to represent defendant. On his second court appearance, the magistrate ordered the jail psychological team to examine defendant. Defendant was not brought into court for that hearing. On August 17, the date set for preliminary examination, the magistrate ordered criminal proceedings suspended and instituted section 1368 proceedings.

The court appointed Drs. Veronica Thomas, a psychologist, and Kaushal Sharma, a psychiatrist, to examine defendant. They found defendant had a "major" or "severe" mental illness. Both found defendant was presently competent to stand trial due to the effects of the medication he had been prescribed. Defendant told Dr. Thomas he takes his medication "sometimes," but it does not stop the voices he hears constantly, and it makes him tired. He told Dr. Sharma he had stopped taking his medication. Both experts concluded defendant could decompensate and become incompetent if he continued to refuse medication.

On October 16, 2009, the parties waived the right to have a jury determine competence, and submitted the issue to the court on the reports prepared by the appointed doctors. The court found defendant was not mentally incompetent under section 1368, and reinstated criminal proceedings. The preliminary examination was held 12 days later and defendant was bound over for trial on the charged offenses.

The information charged the same offenses as the complaint and was filed on November 6, 2009. The court arraigned defendant three days later. Defendant was not brought into court at the following two court appearances. On December 14, 2009, the court appointed the alternate public defender to represent defendant when the public defender declared a conflict of interest. Two weeks later, defendant requested to represent himself. The request was apparently triggered by the alternate public defender's request to continue the trial date. Defense counsel did not state a doubt as to defendant's competence. Defendant filled out the *Faretta*[2] waiver form, the court advised him of the pitfalls of self-representation, relieved appointed counsel, and granted defendant's request. The matter was assigned to a trial court. Jury selection began a week later. The next morning, the jury heard the evidence, heard the argument, and was instructed. It returned its guilty verdicts at 1:50 that afternoon, after taking more than an hour and a half for lunch.

Prior to opening statements, the court spoke to defendant about the procedure to be used when dealing with exhibits. Defendant stated he had photographs and pages out of books, including the Bible, that he wanted to use as exhibits. When the court asked how pages from the Bible were relevant, defendant responded: "What I have to do here is I have to demonstrate that there's something else going on in this world that people are aware of. I'm going to make allegations about the plaintiffs in this case that they aren't even human, and that they're—" At this point the court interrupted and asked, "The defense is they're not human?" Defendant confirmed that was his defense. He stated that when he used the term "plaintiffs," he meant "both" people who would testify. The court changed the subject, telling defendant that since the witnesses each have a record, the prosecutor may ask them about their prior convictions. Immediately thereafter defendant stated, "Judge, what I'm going to ask is [if] these individuals are from Sodom and Gomorra. They're individuals that are among us that are not human. There's a saying, 'when pigs fly.' Shoulder blades are symbolic of angelic beings." He went on to say, "Shoulder blades are symbolic of angelic beings. These two that are going to be taking the stand do not have shoulder blades. Okay?" He continued, "All I need to do, okay, if my assertion of their anatomy is correct, they have a bone that runs from here to here. They cannot shrug their shoulders. That's all I'm asking."

---

[2] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].

Kim Demeire testified he met defendant at a bus stop in Seal Beach, in the summer of 2009. Defendant was living on the street, so Demeire offered defendant a place to live with him in his mobilehome. Defendant was to pay rent of $400 a month, payable $100 a week. He paid for three weeks. On August 1, 2009, Demeire told defendant the rent was $400 a month, "no more weekly." Defendant agreed.

Defendant had been drinking that day and Demeire left defendant's bedroom after talking about the rent. Demeire went out to the porch and sat down. Then, "all of a sudden," he heard defendant say, "I'm sick of hearing about that," and Demeire was struck over the back of his head with a beer bottle. Defendant started punching Demeire with both fists while Demeire was on the ground. Demeire said he had been gouged in his right shoulder blade and was bleeding. He got back to his feet and told defendant to "get out." Defendant went back to his bedroom and Demeire swept up the broken glass. The next-door neighbor, Robert Geddes, came over and confronted defendant. By the time the police arrived, defendant had already left.

The wound to Demeire's shoulder took 14 stitches to close. One of his ears had been cut as well.

When time came to cross-examine Demeire, defendant stated, "At this time, I don't know if I really think that this is the imposter." The court told defendant to "[j]ust ask the question." Defendant then asked his only question: "Can you shrug your shoulders like this?" Demeire did and defendant stated, "That's all I have. This isn't the man that I believe attacked me."

Geddes identified defendant as having been Demeire's roommate for one month. On the date of the incident, Geddes heard yelling and banging at Demeire's residence and went to see if Demeire was "having a seizure or something." He saw broken glass and Demeire standing, holding a broom. There was blood on Demeire's neck and back. Defendant was seated on a bed. Geddes asked defendant if he just hit Demeire with a beer bottle and defendant said, "Yes, from behind." Geddes told defendant to leave. Defendant did not cross-examine Geddes.

The court sentenced defendant to the middle term of three years in state prison. Defendant subsequently filed a petition for a writ of habeas corpus, which we deemed a notice of appeal.

## II

## DISCUSSION

■ "A person cannot be tried or adjudged to punishment while that person is mentally incompetent." (§ 1367, subd. (a).) " 'Both the due process clause of the Fourteenth Amendment to the United States Constitution and state law prohibit the state from trying or convicting a criminal defendant while he or she is mentally incompetent. [Citations.]' " (*People v. Lewis* (2008) 43 Cal.4th 415, 524 [75 Cal.Rptr.3d 588, 181 P.3d 947].) Due process and state law "require a trial judge to suspend trial proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.] The court's duty to conduct a competency hearing may arise at any time prior to judgment. [Citation.] Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. [Citations.] But to be entitled to a competency hearing, 'a defendant must exhibit more than . . . a preexisting psychiatric condition that has little bearing on the question . . . whether the defendant can assist his defense counsel.' [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 847 [48 Cal.Rptr.3d 1, 141 P.3d 135].)

"Absent substantial evidence of a defendant's incompetence, 'the decision to order such a hearing [is] left to the court's discretion.' [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 432 [25 Cal.Rptr.3d 672, 107 P.3d 790].) If this case involved only defendant's conversation with the court about his defense, that conversation may not have compelled institution of competency proceedings. However, the record contains much more indicating defendant was incompetent.

■ " ' "[M]ore is required to raise a doubt [of competence] than mere bizarre actions [(*People v. Kroeger* (1964) 61 Cal.2d 236, 243–244 [37 Cal.Rptr. 593, 390 P.2d 369])] or bizarre statements [(*People v. Williams* (1965) 235 Cal.App.2d 389, 398 [45 Cal.Rptr. 427])] . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [(*People v. Jensen* (1954) 43 Cal.2d 572, 579 [275 P.2d 25])]." ' [Citation.]" (*People v. Danielson* (1992) 3 Cal.4th 691, 727 [13 Cal.Rptr.2d 1,

838 P.2d 729], overruled on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618] [vicinage clause of 6th Amend. does not apply to state criminal trial].) That "more" exists here.

Unlike the reports before the court in *People v. Jensen, supra*, 43 Cal.2d 572, stating, "Jensen has a 'psychopathic personality,' that he is 'hedonistic, immature and an extremely dangerous and homicidal type of individual,' and a 'constitutional psychopath' whose prognosis for a satisfactory adjustment to society 'seems hopeless' " (*id.* at p. 579), having nothing to do with Jensen's competence to stand trial, the reports in the present matter dealt exclusively with defendant's fragile competence and its evident dependence upon continued medication. The reports in the present case also informed the court defendant had stopped taking his prescribed medication and warned of decompensation.

In *People v. Kroeger, supra*, 61 Cal.2d 236, the defendant's bizarre actions included "several hundred comments and outbursts" during trial, as well as singing while she was on the witness stand. (*Id.* at p. 243.) However, the trial judge did not err in failing to hold a competency hearing because "[u]ncontradicted psychiatric testimony was introduced at the guilt trial that [defendant] was a cunning and diabolical liar, that her conduct in court did not show insanity, and that she was feigning insanity and acting in the manner she thought a mentally disordered person would act." (*Id.* at pp. 243–244.) Again, in the present case, the experts concluded that while defendant was competent at the time he was examined, competence was dependent upon medication compliance. Additionally, Dr. Sharma's report stated defendant had stopped taking his medication, and defendant told Dr. Thomas the medication does not help him, he does not like taking it, but he takes it "sometimes." Both doctors warned of decompensation if defendant continued to refuse medication.

In *People v. Williams, supra*, 235 Cal.App.2d 389, the bizarre statements made by the defendant consisted merely of his comment that his common law wife " 'has been my wife since the World began,' " that his statement " 'speak[s] for itself,' " and when asked by the court to explain the first statement because one could think there was something mentally wrong with the defendant for making the statement, the defendant said, " 'Well, I will remain mute. I have said what I said.' " (*Id.* at p. 398, fn. 3.)

█ Bizarre statements or actions, taken in isolation, do not require a court to hold a hearing to determine a defendant's competence to stand trial. The defendants in *Kroeger* and *Williams* lacked any psychiatric history. The evidence in *Kroeger* directly contradicted any inference mental illness caused

her bizarre actions. (*People v. Kroeger, supra,* 61 Cal.2d at pp. 243–244.) In *Williams,* the only bizarre statement was that Williams's wife has been his wife since the world began, a perhaps poetic expression of love shared by many a husband. Defendant, on the other hand, was known to be severely mentally ill. It was also known he had discontinued his medication and that without medication he could decompensate and become incompetent.

In finding defendant competent to stand trial, Dr. Thomas stated in reference to the charged incident, defendant "has an explanation for his behavior that is rational." For Dr. Thomas to have reached that conclusion, defendant had to have given her a much different defense from the one he revealed to the trial judge, unless his defense was that he was insane at the time of the charged incident. No such plea had been entered.

 Thus, our conclusion that the trial court was required to institute competency proceedings is not based upon mere bizarre statements or actions taken in isolation. "In resolving the question of whether, as a matter of law, the evidence raised a reasonable doubt as to defendant's mental competence, we may consider all the relevant facts in the record. [Citations.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1217 [24 Cal.Rptr.3d 112, 105 P.3d 487].)

Defendant's statements taken together with the experts' reports provide the substantial evidence necessary to demonstrate a reasonable doubt as to whether he had in fact decompensated and become incompetent as the experts had warned. Even if we were to assume this evidence was not enough to demonstrate the requisite reasonable doubt as to defendant's competence, given the record before the court demonstrating defendant's gossamer competence, the court should have made an inquiry to determine whether defendant had, in fact, continued to refuse medication.

 The controlling statutes anticipate a situation where the trial court has some doubt about the defendant's competence, but is undecided whether that doubt is sufficient to institute competency proceedings. "[S]ection 1368 provides that if the trial court has *any* doubt as to the defendant's competence to stand trial, it must state that doubt in the record and inquire of counsel whether, in his or her opinion, the defendant is mentally competent. [Citation.]" (*People v. Young, supra,* 34 Cal.4th at p. 1216, italics added.) Of course, when the defendant represents himself, there is no defense counsel to answer the court's concerns.

■ A defendant is competent to stand trial if "he is able to understand the nature and purpose of the proceedings taken against him *and to conduct his own defense in a rational manner.* [Citations.]" (*People v. Merkouris* (1959) 52 Cal.2d 672, 678 [344 P.2d 1], italics added, overruled on another ground in *People v. Pennington* (1967) 66 Cal.2d 508, 518–519 [58 Cal.Rptr. 374, 426 P.2d 942].) While it may be argued there is nothing in the record to call into question whether defendant understood the nature and purpose of the proceedings, the evidence established a reasonable doubt as to whether he could conduct his own defense in a rational matter.

■ While an appellate court is generally " ' "in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper" ' " (*People v. Marshall* (1997)· 15 Cal.4th 1, 33 [61 Cal.Rptr.2d 84, 931 P.2d 262]), it is readily apparent defendant did not feign insanity to delay the proceedings. He opted for self-representation precisely because his appointed counsel sought to continue his trial. Defendant did not want his trial delayed.

Neither is there anything in the record to indicate that defendant's defense to the charge—that the victim and his next-door neighbor were not human—was the result of sheer temper. That was his *defense*. It was not triggered by anything the court did and defendant never expressed any frustration or dissatisfaction with any of the court's rulings or actions before he informed the court of his defense.

■ Substantial evidence demonstrated a reasonable doubt as to defendant's competence and the trial court erred in not conducting a hearing to determine his competence.[3] Although it was suggested at oral argument the proper remedy would be to remand the matter to the trial court for a retrospective competency hearing (see *People v. Ary* (2004) 118 Cal.App.4th 1016 [13 Cal.Rptr.3d 482]), our Supreme Court held in *People v. Young, supra,* 34 Cal.4th at page 1217, that "[t]he correct procedure . . . [is] to reverse the judgment of conviction." (*People v. Ary* (2011) 51 Cal.4th 510, 515, fn. 1 [120 Cal.Rptr.3d 431, 246 P.3d 322].)

---

[3] Our holding is based upon the facts known to the trial court at the time. The subsequently prepared probation and sentencing report demonstrates the depth to which defendant's mind can sink when unmedicated. The probation officer relayed Dr. Thomas's statements to her about defendant's "severe, chronic mental illness" and stated probation records indicate defendant was hospitalized in 2002, when he believed he saw aliens crawl out of his skin and used a blow torch to burn off what he believed were tentacles growing out of his body, suffering second- and third-degree burns to his neck and arms in the effort. For defendant, the existence of nonhumans in human bodies is, at times, his reality, but it is not a rational defense (absent a plea of not guilty by reason of insanity).

## III

## DISPOSITION

The judgment is reversed and the cause remanded for further proceedings pursuant to section 1368 to determine defendant's present competency to stand trial.

Bedsworth, Acting P. J., and Aronson, J., concurred.