Filed 9/10/25  P. v. Leonard CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C095999 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE014579) |
| v. | |
| MICHAEL JOHN LEONARD, | |
| Defendant and Appellant. | |

Defendant Michael John Leonard was convicted of 41 sexual offenses and sentenced pursuant to the "One Strike" law (Pen. Code,[1] § 667.61) for 36 of those convictions.  In total, the trial court sentenced defendant to serve 770 years to life, plus five years in prison.  On appeal, defendant contends the trial court should have ordered a competency evaluation, the prosecution provided insufficient notice of the One Strike

---

[1]     Further undesignated section references are to the Penal Code.

allegation attached to 36 of his convictions, and insufficient evidence supported the aggravating circumstances attached to count one.[2]  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

I

*Underlying Facts*

Defendant committed sexual offenses against numerous girls between the ages of six and 13 years old.  The facts underlying most of defendant's convictions are not relevant to his appeal, except to the extent they provide context for his defense.  Among defendant's victims were his daughter and several of her friends.  Some of these victims testified defendant would photograph them nude or in provocative clothing, and often together.  Many of these victims also testified defendant painted their bodies and gave them massages.  These victims further testified to a variety of sex acts defendant performed on them.  Other victims were girls defendant encountered as an artist promoting his book Ryvah:  Plight of the Fairies.  In this regard, defendant told them to wear provocative clothing and planned to record them affectionately dancing with each other and with the understanding they were recording a trailer to promote the book.

Relevant to this appeal, defendant was convicted in count one of annoying and molesting Justine Doe, Emily Doe, June Doe, and Juliet Doe.  The jury also found defendant's crime indicated planning or sophistication and he took advantage of a position of trust.  The jury found not true that defendant's victims were particularly vulnerable.

All four girls testified to the facts underlying this event.  It occurred when the girls were members of a book club and between 13 and 14 years old.  The girls would meet at Justine's house to talk about books and perform creative writing exercises.  Juliet had met

---

[2]     Defendant also argues in his opening brief that insufficient evidence supports count fourteen.  He withdraws this argument in reply.

defendant when responding to a casting advertisement he posted requesting dancers for a trailer to promote his book. Because defendant was a local author, Juliet and her father thought it would be a good idea to invite defendant to the book club to speak to the girls about the process of writing and promoting a book. When defendant came to the book club meeting, he spoke to the girls alone, with two young boys playing video games nearby.

After defendant talked about his book for over a half hour and gave each one of the girls a copy of the manuscript, he asked the younger boys to leave the room. Once the boys left, defendant asked the girls whether they knew what oral sex was. Defendant then told them that if their boyfriends ever asked for oral sex from them, they should perform the act but not swallow their boyfriends' ejaculate. Instead, defendant said, they should give their boyfriends a big, wet, sloppy kiss to discourage them from ever asking for oral sex in the future. Defendant also told the girls that, if their boyfriends ever asked to have anal sex with them, they should present a dildo to their boyfriends to perform anal sex on the boyfriends. According to defendant, this would disgust the girls' boyfriends into not asking for anal sex again. The girls testified they were made uncomfortable by the comments. After the comments, defendant gave each girl his business card and told them to contact him if they wanted to talk more.

II

*Competency Proceedings*

Multiple doctors examined defendant for competency from 2016 until 2021 when the issue went to a jury. Two experts testified to their opinions—made in 2016, 2018, and 2019—that defendant was incompetent to stand trial. The findings were based on a diagnosis that defendant suffered from psychotic delusions that he was chosen by God to pass laws reducing the age of consent and the government was conspiring against this effort by bringing the current charges against him.

3

The experts described defendant's delusions as rigid and fixed, and occupying his thoughts such that he could not carry an organized conversation focused on his criminal case. For example, when asked about his future if found guilty, defendant said the charges were bogus or he was not going to be found guilty because he was doing God's work. He also wanted to invite media to the trial to educate the public about the laws God wanted him to pass. While defendant demonstrated an understanding of the legal system, it was these experts' opinions that defendant's delusions prevented him from being able to understand his legal situation in a rational manner and consult with his counsel in a rational way.

Two additional experts testified to their opinions at defendant's competency jury trial—made in 2019 and 2021—that defendant was competent to stand trial. The experts explained a criminal defendant needed to be diagnosed with a qualifying mental health disorder to be found incompetent. The experts did not believe defendant's delusions were a product of psychosis, and instead believed they were fixed and rigid beliefs resulting from a personality disorder, which does not qualify as a mental health disorder. The experts who believed defendant was competent based their opinions on defendant's organized conversations with them, lack of verifiable delusions or hallucinations, consistent behavior despite antipsychotic medications, and exaggeration of his symptoms. Defendant further demonstrated no impairment in his memory or thinking and showed legal planning and strategy. Further, defendant did not cite to the laws he believed God wanted him to pass as being part of his defense strategy, even though he thoroughly discussed the book he wrote.

Defendant also testified to his belief that he "is real. [He]'s not a fraud. [He is] who [he] say[s he is]. And that is the Messiah." He further testified he would save all humanity and did not need a defense strategy because God showed him the future and the jury was going to find him not guilty. Defendant testified extensively about his book and the laws written in it he wanted passed, which included laws reducing the age of consent.

4

The jury found defendant competent to stand trial.

## III

### *Trial Proceedings*

Soon after being found competent to stand trial, defendant elected to represent himself. In early February 2022, the prosecution filed an amended information alleging 43 counts. At the conclusion of the amended information, it "further alleged . . . defendant . . . has been convicted in the present case or cases of committing an offense specified in subdivision (c) against more than one victim, within the meaning of Penal Code [s]ections 667.61[, subdivision ](e)(4) and 667.61[, subdivision ](j)(2)." The information was later amended to conform to proof presented at trial and included the same sentencing allegation under section 667.61.

Before trial, defendant filed motions in limine requesting dismissal of the case based on speedy trial and discovery violations, as well as ineffective assistance of counsel during the competency stage of his case. Defendant also proffered the testimony of proposed witnesses and some of his proposed questions. The court addressed defendant's motions and his discovery concerns at the in limine motion hearing, including the evidence defendant wanted to introduce at trial.

Defendant explained his defense during the motions in limine hearing, stating, "I have written a book called Ryvah: Plight of the Fairies, and within this novel, I present 15 laws that I wish to pass. [I]t's not just one book. It's not a minor thing, but it's something that consumes my entire life and being and soul and everything. [¶] The laws of Ryvah -- there's 13 books in total. I actually have the covers of seven of them to provide so that I can show, 'Look at all these books'. There's 72 laws in total. [I h]ave all of that. [¶] And these laws of Ryvah are designed to reinforce our constitutional rights, defend the nation of the United States of America, our prosperity, our liberties, protect people. I think they are beautiful. I think God has given me these laws to pass to

5

save humanity, and I have shown them to many people, and the people I've shown them to are profoundly affected by them.

"I believe that I am the Messiah of God and that my mission is to come and pass these laws, and all this is just part of the plan to reach that goal. [¶] Now, [my former attorney] . . . decided that I may not be competent to stand trial based on my beliefs and the idea that I had no fear of conviction because I am doing the will of God . . . [but] I have been consistently doing this for my entire life, not just the last seven years. [¶] . . . [¶] Now, I know that I am being targeted to -- to the Illuminati, the secret governments of the world. They don't want these laws. If I pass my laws, I will shut them down. I will destroy the Illuminati. The secret governments cannot survive with these laws on the books, absolutely not."

Later during the motions in limine hearing, defendant expressed doubt in his own competence based on his former attorney's performance at his competency hearing. He argued that he believed his attorney had acted ineffectively for a variety of reasons, which to defendant would mean his competency trial was unreliable when determining he was legitimately the Messiah. The trial court clarified for defendant that his competency hearing was not conducted for the purpose of determining whether defendant was actually who he believed he was. The court found, "And I will indicate to you that even though you're referencing your belief that you're the Messiah and so forth, you have said and done nothing in this court that suggests to me that you're not competent or that you're not able to represent yourself. The issue of whether you are or [are] not the Messiah is not what that turns on."

At trial, defendant delivered an opening statement. In it, defendant argued that the rights guaranteed by the United States Constitution were "slipping away." He stated, "Look around. Okay. We are almost there. Our world is in trouble, and my laws of Ryvah will fix it. The laws of Ryvah are at the very core of this case in every way, shape and form." Defendant further explained, "In 2006[,] I had the realization -- I talked to

6

God and he said: [¶] [']You're not allowed to [give up]. You are a father now. You have two beautiful children, and I don't care if you have to sacrifice your life, you must protect them.['] [¶] I became Ryvah. I wrote Ryvah: Plight of the Fairies, and I wrote it very, very carefully. Thousands and thousands of hours poured into that book alone, of which there are 13 novels. I wanted to sculpt the social issues that I wanted our society to deal with, and I wanted to camouflage it just enough so that people would see it, talk about it and debate it. [¶] The book is sensual, lightweight erotica. There are no cuss words in the book. The book is designed to be read by a child, a 13-year-old. The book is designed to open up conversation. [¶] Within this book are the laws of Ryvah, 15 laws that I crafted with the inspiration of God, that will rid corruption out of our world. It will shut down the Illuminati, the people who sponsored the Twin Towers, all three World Trade Center skyscrapers that fell in free-fall, the people who sponsored Pearl Harbor and COVID-19."

At trial, defendant cross-examined witnesses concerning their credibility and bias, as well as the circumstances leading to and during their interactions. Defendant also referenced his past conversations with his victims about Ryvah and his efforts to educate them about the laws promoted in his book.

Defendant called four witnesses in his defense. This included Juliet's father, who testified about his meetings with defendant when deciding whether to allow Juliet to work on the trailer for defendant's book. This also included an expert in memory recall who testified about the brain's ability to recall memories and whether memories can be influenced by outside forces. Defendant also called a former girlfriend who testified about his character and the times defendant photographed and painted her body. Finally, defendant called a fellow inmate he met while incarcerated pending trial to testify about his character, the laws of Ryvah, and defendant's efforts to reform government.

Defendant delivered a closing argument wherein he argued he gained consent from his victims before and during his interactions with them. He argued all the victims

7

and witnesses were coerced into lying about the interactions or exaggerating his conduct. He pointed to aspects of their testimony he believed showed inconsistencies. Defendant admitted he photographed nude children, painted children's bodies, engaged in "bonding" by touching them all over their bodies, and gave advice about sex to minors. Defendant argued, "The Illuminati wishes to enslave the world and remove freedom and love. I, as Ryvah, have a powerful tool that manifests in incredible love called bonding." According to defendant, Ryvah is "a state of mind, where your life ceases to have value, except to become a tool of fate, [your] only purpose is to fight for and, if need be, die for the absolute unconditional right to freedom and love." To defendant, the conduct he was alleged to have committed was either done with the victim's consent or the product of manipulation by outside influences that sought to destroy the laws of Ryvah.

While the jury found defendant guilty of all 42 counts, the trial court dismissed count eleven in the interest of justice. Based on the jury's true findings as to the One Strike special circumstance and the aggravating circumstances attached to count one, the court sentenced defendant to a total of 770 years to life, plus five years in prison.

Defendant appeals.

DISCUSSION

I

*The Record Does Not Indicate Defendant Was Incompetent During Trial*

Defendant contends the trial court erred by failing to order a competency examination during trial when defendant relied on his delusions as a defense to the crimes charged. We disagree.

"The constitutional guarantee of due process forbids a court from trying or convicting a criminal defendant who is mentally incompetent to stand trial." (*People v. Rodas* (2018) 6 Cal.5th 219, 230.) Section 1367, subdivision (a) incorporates this constitutional standard by stating, "A defendant is mentally incompetent . . . if, as a result of a mental health disorder or developmental disability, the defendant is unable to

8

understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

A trial court's "duty to assess competence is a continuing one." (*People v. Rodas*, *supra*, 6 Cal.5th at p. 235, fn. 5.) "A trial court's duty to conduct a competency hearing may arise at any time before entry of judgment. [Citation.] However, after a defendant is found competent, the court need not conduct a second competency hearing unless presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of the earlier finding." (*People v. Tejeda* (2019) 40 Cal.App.5th 785, 793.) "The evidentiary standard by which the trial court evaluates" this "showing is substantial evidence." (*People v. Easter* (2019) 34 Cal.App.5th 226, 242.)

" 'The decision whether to order a competency hearing rests within the trial court's discretion, and may be disturbed upon appeal "only where a doubt as to [mental competence] may be said to appear as a matter of law or where there is an abuse of discretion." ' [Citation.] '[A]bsent a showing of "incompetence" that is "substantial" as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial.' " (*People v. Parker* (2022) 13 Cal.5th 1, 29.)

Defendant relies on *Murdoch*, where doctors concluded the defendant was competent, but were concerned he would not remain competent given his refusal to take his prescribed medication. (*People v. Murdoch* (2011) 194 Cal.App.4th 230, 232-233.) The trial court found the defendant was not incompetent. (*Ibid*.) About two months later, the defendant was permitted to represent himself at trial. (*Id*. at pp. 233-234.) Prior to opening statements, the defendant informed the trial court his defense was that the alleged victim was not a human being. (*Id*. at pp. 234-235.) To prove this, he wanted to introduce pages from the Bible and demonstrate the victim did not have shoulder blades, which he believed was " 'symbolic of angelic beings.' " (*Ibid*.) The sole question he

9

asked of a witness was whether the victim could shrug his shoulders. (*Id.* at p. 235.) The Court of Appeal held that the defendant's bizarre statements, "taken together" with the expert reports (*id.* at p. 238) detailing the "defendant's fragile competence and its evident dependence upon continued medication" (*id.* at p. 237), "provide[d] the substantial evidence necessary to demonstrate a reasonable doubt as to whether [the defendant] had in fact decompensated and become incompetent as the experts had warned" (*id.* at p. 238).

Defendant argues his case is like *Murdoch* because an expert's finding of competency was conditioned on a fact that was not true at trial. For *Murdoch*, that was the defendant's decompensation and failure to medicate. (*People v. Murdoch*, *supra*, 194 Cal.App.4th at pp. 237-238.) For defendant, it was the prosecution experts' testimony he would not rely on his delusions as a defense at trial, which he did rely on. We disagree with defendant's reading of the experts' testimony. The experts did not condition their opinion regarding defendant's competence on his failure to rely on his delusions as a defense. Instead, both prosecution experts testified defendant's delusions were not the product of a mental health disorder. They believed this because defendant presented with organized thoughts, did not experience verifiable delusions or hallucinations, demonstrated no impairment in his memory, and showed legal planning and strategy. Indeed, experts on both sides agreed defendant held fixed and irrational beliefs that he was the Messiah, could talk to God, and the government was conspiring to silence him.

At trial, defendant maintained his fixed beliefs, yet he presented an organized defense, impeached witnesses, emphasized evidence of consent and lack of sexual intent for the more innocent touchings, and presented expert testimony about influences on memory to explain testimony about the more sexualized conduct. Defendant presented clear argument to the trial court and to the jury and was intellectually capable of following the evidence and rebutting it through cross-examination. At no point did

10

defendant speak to figures or people who were not present in the courtroom. While defendant claimed he was chosen by God and the government conspired against him, defendant focused his arguments on the facts of the case. He clearly argued and introduced evidence to support that the alleged conduct was committed with the victim's consent or the product of manipulation by outside influences.

At bottom, defendant's conduct at trial was consistent with his conduct at the competency hearing and the prosecution's experts' testimony. Accordingly, it was not error for the trial court not to order a competency examination during trial.

II

*Defendant Had Adequate Notice The Prosecution*

*Sought To Have Him Sentenced Under The One Strike Law*

Defendant contends he did not have adequate notice he would be sentenced pursuant to the One Strike law. (§ 667.61) We disagree.

To be subjected to any of the penalties under the One Strike law, due process requires a defendant receive sufficient notice. "[I]n addition to the statutory requirements that enhancement provisions be pleaded and proven, a defendant has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for [the defendant's] crimes." (*People v. Mancebo* (2002) 27 Cal.4th 735, 747.) "This goes for sentence enhancements as well as substantive offenses." (*People v. Anderson* (2020) 9 Cal.5th 946, 953.) "To satisfy due process, it is sufficient for an accusatory pleading to provide the defendant fair notice of the particular One Strike sentence the prosecution is seeking and of which facts it intends to prove to support that sentence." (*In re Vaquera* (2024) 15 Cal.5th 706, 720, citing *Mancebo*, at pp. 753-754.)

In *Vaquera*, our Supreme Court invalidated on due process grounds an enhanced 25-year-to-life sentence imposed under the One Strike law on the basis that the pleading alleged the defendant was subject only to the statute's general 15-year-to-life sentence.

11

(*In re Vaquera*, *supra*, 15 Cal.5th at pp. 715, 724, 728.) It concluded the information failed to provide the defendant fair notice of the prosecution's intent to seek the more stringent 25-year-to-life sentence and the factual basis on which it sought that sentence. (*Id*. at pp. 723-725.) In identifying the applicable due process principles, our Supreme Court relied on *Mancebo* for the proposition that, "to satisfy due process, an accusatory pleading must inform the defendant that the prosecution is relying on specific facts to support imposition of a particular One Strike sentence." (*Vaquera*, at p. 719, citing *Mancebo*, *supra*, 27 Cal.4th at pp. 746-747.)

Here, the information's One Strike allegations did not identify the law's application to specific counts. Instead, it generally alleged defendant had been convicted of crimes specified in section 667.61, subdivision (c) against more than one victim pursuant to subdivision (e)(4) and that the prosecution was seeking to sentence defendant under subdivision (j)(2). Read in conjunction with the statutory language, this triggered application of the 25-year-to-life One Strike law (§ 667.61, subd. (j)(2)) based on defendant's commission of a crime under subdivision (c) against multiple victims (§ 667.61, subd. (e)(4)) under the age of 14 years old (§ 667.61, subd. (j)(2)). In defendant's case this meant all of his convictions for section 288, subdivision (a), as those are his only convictions listed in section 667.61, subdivision (c). (See § 667.61, subd. (c)(8).)

Defendant disagrees relying on *Anderson* for the proposition that the prosecution was required to allege the One Strike allegation on every count for which it sought the allegation to apply or at least specify in the general allegation which counts it sought the allegation to enhance. (*People v. Anderson*, *supra*, 9 Cal.5th 946.) We disagree. *Anderson* dealt with the notice required before the prosecution could use a conduct enhancement to enhance the sentence of a particular conviction. (*Id*. at pp. 949-950.) In addition to potentially affecting trial strategy, our Supreme Court held that the prosecution's failure to allege enhancements to each conviction it sought to enhance

12

denied the defendant notice of the potential total sentence because it was reasonable to assume the prosecution had exercised its discretion to limit the defendant's potential sentence to what was pled. (*Id*. at pp. 956, 964.)

On the other hand, the One Strike allegation is a sentencing scheme applicable to defendants who have committed specified conduct. (*People v. Carbajal* (2013) 56 Cal.4th 521, 534.) To that end, "to satisfy due process, an accusatory pleading must inform the defendant that the prosecution is relying on specific facts to support imposition of a particular One Strike sentence." (*In re Vaquera*, *supra*, 15 Cal.5th at p. 719.) Here, the prosecution adequately informed defendant it was seeking to sentence him to 25 years to life under the One Strike sentencing scheme for each qualifying conviction by alleging defendant's crimes had been committed against multiple victims under the age of 14 years old and citing the relevant statutory provisions. Under *Vaquera*, due process was satisfied.

Defendant also argues the prosecution failed to particularize which of the qualifying convictions were subject to the 25-year-to-life sentence and which ones were subject to the 15-year-to-life sentence. The trial court was precluded from sentencing defendant to 25 years to life for some of his section 288, subdivision (a) convictions because the conduct underlying the convictions occurred before the operative date of section 667.61, subdivision (j)(2). (*People v. Betts* (2020) 55 Cal.App.5th 295, 299.) We conclude there was no due process violation under these facts. The information informs defendant the prosecution was seeking 25-year-to-life sentences for all convictions of section 288, subdivision (a). The fact defendant was sentenced to 15 years to life on the same factual showing the prosecution needed to make to secure 25 years to life does not result in improper notice. The purpose of the pleading requirement is "to give sufficient notice to permit the defense to make informed decisions about the case, including whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial." (*People v. Anderson*, *supra*, 9 Cal.5th at p. 964.) The selection of

13

shorter sentences than noticed for some of defendant's convictions did not reduce defendant's sentence in a way that would affect defendant's plea negotiations or his trial strategy. Thus, defendant cannot demonstrate a due process violation.

Accordingly, defendant was provided sufficient notice of the One Strike sentences the prosecution sought.

## III

### *Substantial Evidence Supports The Aggravating Circumstances Attached To Count One*

Defendant contends the evidence does not support the aggravating circumstances that defendant was in a position of trust and acted with sophistication or planning for purposes of imposing the upper term for count one. We disagree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715, italics omitted.)

"An aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.' [Citations.] Aggravating circumstances include those listed in the sentencing rules, as well as any facts 'statutorily declared to be circumstances in aggravation' [citation] and any other facts that are 'reasonably related to the decision being made.' " (*People v. Black* (2007) 41 Cal.4th 799, 817, overruled on other grounds in *People v. Wiley* (2025) 17 Cal.5th 1069, 1085.) California Rules of Court,

14

rule 4.421(a)(11) states that a circumstance in aggravation occurs when "[t]he defendant took advantage of a position of trust or confidence to commit the offense."

Relying on *People v. Dancer* (1996) 45 Cal.App.4th 1677, 1695, disapproved on other grounds in *People v. Hammon* (1997) 15 Cal.4th 1117, 1123, defendant argues the position of trust or confidence factor requires a special relationship between himself and his victims. Not so. The California Rules of Court simply state that a circumstance in aggravation exists when "[t]he defendant took advantage of a position of trust or confidence to commit the offense," with no requirement of a special relationship between the defendant and the victim specified. (Cal. Rules of Court, rule 4.421(a)(11).) *Dancer* did not specifically hold that a special relationship between the defendant and the victim is required for this aggravating circumstance to be found true. Instead, accepting the defendant's argument that a special status was required, the *Dancer* court held that such a status was demonstrated on the facts of that case. (*Dancer*, at pp. 1694-1695.) A defendant may often need to establish a relationship with the victim to create a position of trust. As a result, cases involving this aggravating circumstance typically note the status the defendant had in relation to the victim that placed the defendant in a position of trust or confidence. (See, e.g., *People v. DeHoyos* (2013) 57 Cal.4th 79, 155 [the defendant approached a child walking home alone from school and represented himself to be a teacher, "prey[ing] on her naivete and natural deference to a teacher's position of authority"]; *People v. Baughman* (2008) 166 Cal.App.4th 1316, 1323 [single parent of victim]; *People v. Dominguez* (2008) 166 Cal.App.4th 858, 869 [employee with unsupervised access to victim's car]; *People v. Franklin* (1994) 25 Cal.App.4th 328, 331, 337-338 [adult caring for young victim]; *People v. Clark* (1992) 12 Cal.App.4th 663, 666 [stepfather entrusted with victim's care]; *People v. Simon* (1983) 144 Cal.App.3d 761, 764 [treasurer of soccer league].) None of these decisions, however, state that a special relationship between the defendant and the victim is necessary to prove the aggravating

15

circumstance that the defendant took advantage of a position of trust to commit the offenses.

Here, sufficient evidence demonstrates defendant took advantage of a position of trust. Defendant relied on one of the girls in the book club and an adult in the girls' lives to introduce him, giving the impression to the girls that their friend and an adult had vouched for defendant's trustworthiness. Defendant also relied on his status as a local author who held special and specific knowledge valued by the group to speak to the girls without adult supervision. Taken together, sufficient evidence demonstrates defendant took advantage of a position of trust when committing count one.

Defendant further argues insufficient evidence demonstrated he acted with planning and sophistication (Cal. Rules of Court, rule 4.421(a)(8)) when making lewd comments to the book club because there is no indication the comments were anything more than made off the cuff. Again, we disagree. One of the girls testified that, before making his comments, defendant asked the two younger boys present in the room to leave. This shows an effort on behalf of defendant to avoid detection. Further, it was after discussing the process of writing and promoting his book for over a half hour that defendant made his offensive comments, demonstrating a plan to ingratiate himself with the girls so they would be more likely to accept his comments as appropriate banter. Finally, following his offensive comments, defendant distributed his contact information for the girls to use if they wanted to meet with him again, demonstrating a plan to further the inappropriate interactions. Together, defendant's planning activity rendered his annoying and molesting conviction distinctively worse than the ordinary. (See *People v. Black*, *supra*, 41 Cal.4th at p. 817.)

Accordingly, sufficient evidence supported the aggravating factors attached to count one.

16

DISPOSITION

The judgment is affirmed.

/s/
ROBIE, J.

We concur:

/s/
EARL, P. J.

/s/
WISEMAN, J.*

---

\*      Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

17