Filed 7/18/13  P. v. Llamas CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B238029 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA371036) |
| v. | |
| JOSE LLAMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William N. Sterling, Judge.  Reversed in part, remanded, and affirmed in part.

Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Jose Llamas appeals his convictions for first degree burglary, misdemeanor petty theft, and grand theft. The trial court sentenced him to a term of 17 years in prison pursuant to the Three Strikes law. Llamas contends the court abused its discretion by failing to conduct a second competency hearing, and the evidence was insufficient to support the grand theft charge. We reverse Llamas's conviction for grand theft and remand for further proceedings on that charge. In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

Viewed in accordance with the usual rules governing appellate review (*People v. Johnston* (2003) 113 Cal.App.4th 1299, 1303-1304; *People v. Robinson* (1997) 53 Cal.App.4th 270, 273), the evidence relevant to the issues presented on appeal established the following. On the afternoon of May 5, 2010, Llamas, Mark Figueroa, and Hector Cruz entered a gated parking garage at the Evo apartment complex located at 1155 South Grand Avenue in Los Angeles. The men stole two bicycles which had been locked to a bike rack in the garage, using bolt cutters and/or a hacksaw to cut through the locks. Alerted to the burglary-in-progress by an employee, apartment personnel and officers from the Business Improvement District's bicycle patrol unit apprehended the trio. Figueroa was caught in the garage, holding one of the bicycles; Cruz was stopped as he attempted to flee from the garage; and Llamas was apprehended after a brief chase out of the garage and through adjoining streets. During the chase, Llamas dropped a backpack, which contained bolt cutters and a hacksaw.

John Park, the owner of one of the bicycles, testified that he had purchased his bike three to four years previously for approximately $450. Matthew Ryder, the owner of another one of the bicycles, testified that he had purchased his bike from a friend six months previously for approximately $450. However, based on his own research, he believed the true value of the bike was between $1,000 and $1,300.

2

2. *Procedure.*

Trial was by jury. Llamas was convicted of first degree burglary (Pen. Code, § 459);[1] misdemeanor petty theft of Park's bicycle, a lesser included offense to the grand theft charged in count 2 (§ 484, subd. (a)); and grand theft of Ryder's bicycle (§ 487, subd. (a)). In a bifurcated proceeding, the trial court found Llamas had suffered a prior conviction for rape by means of force or violence (§ 261, subd. (a)(2)), a "strike" and a serious felony. (§§ 667, subds. (a), (b)-(i) & 1170.12, subds. (a)-(d).) The trial court denied Llamas's *Romero* motion[2] and sentenced him to a term of 17 years in prison pursuant to the Three Strikes law. It imposed a restitution fine, a suspended parole restitution fine, court security assessments, and criminal conviction assessments. Llamas appeals.

## DISCUSSION

1. *The trial court did not abuse its discretion by failing to declare a doubt and suspend proceedings pending a second competency hearing.*

a. *Additional facts.*

Prior to trial, Llamas was examined by two mental health professionals, Dr. Jack Rothberg and Dr. Haig Kojian. In a report dated July 7, 2010, Dr. Rothberg found Llamas was "marginally" competent to stand trial. Dr. Rothman explained that Llamas had "emotional difficulties" going back to 2006, when he was suicidal. In 2007 he began hearing voices and had paranoid ideas. He had been medicated for his psychiatric problems. Llamas's "fund of knowledge, ability to abstract and general intellectual functioning" were "grossly impaired." Dr. Rothberg concluded Llamas suffered from a "developmental delay, possibly mental retardation," as well as paranoid schizophrenia. He nonetheless had a rudimentary understanding of the nature and purpose of trial proceedings and a limited capacity to assist counsel in preparing his defense. The report concluded that Llamas was "competent to stand trial albeit very marginally so. He will

---

[1] All further undesignated statutory references are to the Penal Code.

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

3

need a great deal of support to get through the proceedings. . . . He has obviously been through the criminal justice system on many previous occasions. He certainly should be maintained on anti-psychotic medication to at least prevent psychosis from further hampering his competency, but at this point I believe he can proceed to trial."

In a report dated September 25, 2010, Dr. Kojian examined Llamas at the request of Llamas's attorney, and concluded Llamas was incompetent to stand trial. Llamas told Dr. Kojian that he heard voices when he was falling asleep at night. He had used methamphetamine on a daily basis for years. He had previously used PCP, " 'crack,' " and heroin as well. Jail mental health records showed Llamas had been diagnosed with psychosis; had been observed talking to himself; had admitted experiencing auditory hallucinations; was mildly depressed; and had been placed on several psychotropic medications. He did not demonstrate any acute symptoms of psychosis at the time of the Kojian evaluation. His interview responses suggested cognitive deficits or lower intellectual functioning.

Llamas was aware he had been charged with burglary for stealing a bike; that felonies were more serious than misdemeanors; and that his attorney's duty was to assist him and attempt to obtain his release from custody. He understood the meaning of a plea bargain and the concepts of guilt and innocence. Nonetheless, Dr. Kojian was "concerned by a number of the statements [Llamas] made during the interview," including that his lawyer was working on his behalf, but "also on the side of the judge and police"; he did not understand the district attorney's duty or function; he made unclear statements about "people sitting at two desks and making decisions or talking" during trial; he did not understand the function of the jury; and he was confused about the testimony his father could give at trial. Dr. Kojian was also concerned that Llamas did not believe his medications were helpful. The report concluded: "it does appear . . . that [Llamas] should be considered incompetent to proceed at this time" and would benefit from a restoration to competency program.

On September 27, 2010, the trial court declared a doubt as to Llamas's mental competency and suspended criminal proceedings. On December 1, 2010, the court found

Llamas incompetent to stand trial, based on Dr. Kojian's report. It ordered Llamas committed to Patton State Hospital until his competency could be restored.

In a report dated February 2, 2011, Patton State Hospital's Wellness and Recovery Team reported that Llamas was making progress and was compliant with his treatment and medication regimen, but was not yet competent to stand trial and should be retained for further treatment. Llamas continued to experience delusions and was unable to discuss the evidence of the crime in a "linear and rational manner." His relationship with his attorney was "greatly tinted by paranoid delusions and expectations not grounded in reality and logic." His understanding of the charges and of possible sentence was impacted by "grandiose and persecutory delusions."

In a report dated June 8, 2011, the Wellness and Recovery Team concluded Llamas was competent and could be returned to court to stand trial. Llamas had "responded well to treatment. His target symptoms are voices, substance-abuse issues, depression, antisocial personality and a learning disability. He has gradually become clearer, coherent, organized, responsive, and well groomed. Mr. Llamas was not seen responding to internal stimuli although he self reports that he continues to hear voices." Llamas still had "substance-abuse behaviors" and had tested positive for cannabis use while hospitalized. Llamas "continue[d] to present with antisocial personality traits," including "[f]ailure to conform to social norms with respect to lawful behaviors as indicated by performing acts that are grounds for arrest; deceitfulness as indicated by repeated lying; impulsivity; irresponsibility; and lack of remorse. . . . Cognitively, he demonstrates an adequate level of functioning. Clinically, however, Mr. Llamas has demonstrated clarity of thought and unimpaired cognitive capacity." He was "cooperative with the unit routine; however, he continues to have periods where he is defiant, does not follow through with staff direction, and challenges authority." He was considered to be able to cooperate with his attorney and discuss the evidence surrounding his charges in a logical and coherent manner.

On June 23, 2011, Llamas returned to court. Defense counsel suggested Llamas might still be incompetent. Counsel explained: "I just spoke to him. He's still acting

5

awfully strange, so I'm not certain I can submit on the report." At counsel's request, the trial court continued the matter. Defense counsel suggested, "Maybe I can get another doctor to look at him, get a final determination."[3]

On July 25, 2011, both the prosecutor and defense counsel submitted on the certification notice from Patton State Hospital, and criminal proceedings were reinstated.

On September 23, 2011, before opening statements, the bailiff informed the trial court that Llamas was refusing to get dressed. Defense counsel informed the court: "[T]his morning I've had two conversation[s with] Mr. Llamas. He's refusing to not only get dressed but also to come out into the courtroom and he expressed repeatedly he was hearing voices and pacing and started saying I was against him and developed some sort of conspiracy. [¶] When I was waiting to be let into the courtroom, I could hear him talking to himself in a loud manner. He is a Patton return. So Patton had cleared him. This was markedly different than the last two days we've had him and the day before we sent the case here."

The trial court then conducted proceedings in lock up in order to evaluate Llamas. The following colloquy transpired:

"[Defense counsel]: Mr. Llamas, . . . . the reason we're here is we're trying to determine whether you're okay to go to trial. When I say 'okay,' I mean are you competent?

"[Llamas]: Yeah. But you're the one that the—I fucking don't understand what's going on. You fucking with me.

"[Defense counsel]: Well, that's a different issue, if you just think I'm the problem. But I'm more concerned with whether you are competent to—this morning, you told me you're hearing voices and that you did not want to come out and the voices were telling you things. And it was much worse this morning than it was at the last couple of days; is that right?

---

[3]     The record does not indicate whether such an evaluation was performed.

6

"[Llamas]: Yeah.

"[Defense counsel]: So what I'm trying to determine is whether these voices that you're hearing—because I heard you were talking to yourself. Were you talking—responding to the voices? Is that why you were talking?

"[Llamas]: I been hearing it since—fucking years.

"[Defense counsel]: It was worse today than—

"[Llamas]: I'll be okay in 20 minutes, man.

"[Defense counsel]: Just 20 minutes. Are you ready to go to trial?

"[Llamas]: I'm not going out there with those people. You have to kick those people out.

"[Defense counsel]: Those are our jurors, Mr. Llamas. I'm afraid those are the people we're going to have for the trial.

"[Llamas]: The ones you fucking picked. I already told you I know where you're at. And I don't know what your guy's doing. Stupid, you know, what I mean.

"[The Court]: Stop for a second. [¶] I see no indication that the defendant is incompetent. He appears rational, and he may be dissatisfied. But there's no indication that he doesn't know what's going on; so I'm going to advise that we will proceed to trial. If Mr. Llamas refuses to come out, we will go to trial regardless, and I will advise the jury that the defendant has voluntarily absented himself. We're going to leave.

"[Llamas]: I'll tell you, you have to fix that little problem I already told you about.

"[The Court]: We're going to stop for a second. The court reporter and I are going to leave. And I'm going to leave you here to talk to [defense counsel]. But I'm advising you that I see no indication that you are not competent.

"[Llamas]: I'm not—(unintelligible)—telling you that shit, man.

"[The Court] Hang on.

"[Llamas]: The fucking thing is this fucking guy right here for a whole fucking year been on my back. He does—I don't want to deal with this guy no more.

7

"[The Court]: We have the jury out there, and we're about to start trial. If you don't come out, the jury will be told you're refusing and voluntarily absenting yourself.

"[Llamas]: I don't know what the fuck you're talking about."

Thereafter, Llamas was present in court for opening statements. Llamas did not engage in any outbursts or disruptive behavior during trial, and defense counsel did not renew his concerns about Llamas's mental state or request that proceedings be suspended.

b. *Applicable legal principles.*

Llamas asserts that the trial court's failure to declare a doubt and suspend proceedings a second time was an abuse of discretion. We disagree.

Both the due process clause of the Fourteenth Amendment and state law prohibit the trial of a criminal defendant while he or she is mentally incompetent. (*People v. Elliott* (2012) 53 Cal.4th 535, 582; *People v. Lewis* (2008) 43 Cal.4th 415, 524; *People v. Murdoch* (2011) 194 Cal.App.4th 230, 236; § 1367, subd. (a).) A defendant is deemed competent only if he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and has a rational and factual understanding of the proceedings against him. (*People v. Ary* (2011) 51 Cal.4th 510, 517; *Elliott*, at pp. 582-583; § 1367, subd. (a).) "The focus of the inquiry is the defendant's mental capacity to understand the nature and purpose of the proceedings against him or her. [Citations.]" (*People v. Blair* (2005) 36 Cal.4th 686, 711.) A defendant is presumed competent unless it is proved otherwise by a preponderance of the evidence. (*People v. Ramos* (2004) 34 Cal.4th 494, 507; *Ary*, at p. 518; § 1369, subd. (f).) The defendant has the burden of establishing lack of competence. (*Ary*, at p. 518)

A trial judge must "suspend proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.]" (*People v. Blair, supra,* 36 Cal.4th at p. 711; § 1368, subd. (a); *People v. Ary, supra,* 51 Cal.4th at p. 517; *People v. Ramos, supra,* 34 Cal.4th at p. 507; *People v. Murdoch, supra,* 194 Cal.App.4th at p. 236.) Evidence of

incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. To be entitled to a competency hearing, a defendant must exhibit more than a preexisting psychiatric condition that has little bearing on the question of whether he can assist his defense counsel. (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) Counsel's opinion that the defendant is incompetent, although entitled to some weight, does not compel the court to order a competency hearing. (*People v. Lewis, supra,* 43 Cal.4th at p. 525; *Blair*, at p. 719; *People v. Panah* (2005) 35 Cal.4th 395, 433.)

The court's duty to conduct a competency hearing may arise at any time prior to judgment. (*People v. Rogers, supra,* 39 Cal.4th at p. 847.) " ' "When a competency hearing has already been held and defendant has been found competent to stand trial, . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. [Citations.]" ' " (*People v. Taylor* (2009) 47 Cal.4th 850, 864; *People v. Kelly* (1992) 1 Cal.4th 495, 542; *People v. Lawley* (2002) 27 Cal.4th 102, 136.)

Failure to declare a doubt and to conduct a competency hearing when there is substantial evidence of incompetence requires reversal of the judgment. (*People v. Blair, supra,* 36 Cal.4th at p. 711; *People v. Rogers, supra,* 39 Cal.4th at p. 847.) "A trial court's decision whether or not to hold a competence hearing is entitled to deference, because the court has the opportunity to observe the defendant during trial." (*Rogers*, at p. 847; *People v. Lewis, supra,* 43 Cal.4th at p. 525.) "In resolving the question of whether, as a matter of law, the evidence raised a reasonable doubt as to defendant's mental competence, we may consider all the relevant facts in the record." (*People v. Young* (2005) 34 Cal.4th 1149, 1217.)

c. *Application here.*

In support of his argument that a second competence hearing was required, Llamas points to his refusal to change into trial attire; his "irrational behavior"; his comments that, inter alia, he did not know what was going on, did not know what the judge was

9

talking about, and did not wish to enter the courtroom with jurors; his report of hearing voices; the absence of any evidence he had taken his medication; and defense counsel's report that Llamas appeared to believe defense counsel was conspiring against him. Coupled with the prior incompetency finding and his history of mental illness, Llamas urges, these facts amounted to substantial evidence requiring the court to suspend proceedings and order a second competency hearing.

The evidence Llamas points to does not, in our view, constitute a substantial change of circumstances, or new evidence casting serious doubt on the Patton State Hospital competence finding. (See *People v. Taylor, supra,* 47 Cal.4th at p. 864.) Llamas was still hearing voices at the time the hospital team concluded he was competent; therefore this circumstance did not demonstrate he had decompensated. His prior psychiatric and drug abuse history was obviously not new evidence, as it was known and taken into consideration by the hospital team. Moreover, "even a history of serious mental illness does not necessarily constitute substantial evidence of incompetence . . . ." (*People v. Blair, supra,* 36 Cal.4th at p. 714; *People v. Ramos, supra,* 34 Cal.4th at p. 508.) Given that Llamas bore the burden to show incompetence, the mere absence of evidence he had taken his medication at the commencement of the trial is not enough to demonstrate changed circumstances. Llamas's refusal to dress for trial, belligerent manner, and refusal to enter the courtroom may well have indicated nothing more than defiance, a failure to conform to social norms, and a challenge to authority—all problems extant when the competency finding was made. To raise a doubt as to competence, a defendant must exhibit more than "bizarre, paranoid behavior, strange words, or a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist his defense counsel," or statements of defense counsel that defendant is incapable of cooperating in his defense. (*Ramos*, at p. 508; *People v. Ramirez* (2006) 39 Cal.4th 398, 431; *People v. Lewis, supra,* 43 Cal.4th at p. 524; see generally *People v. Koontz* (2002) 27 Cal.4th 1041, 1064 [defendant's rambling, marginally relevant speeches, even if evidence of some form of mental illness, did not show he lacked understanding of proceedings or ability to assist in the defense]; *People v.*

10

*Farnam* (2002) 28 Cal.4th 107, 203 [defendant's agitation and apparent willingness to speak out in front of the jury "f[e]ll far short of indicating a deteriorating mental state"].)

Further, Llamas's comment that he was "not going out there with those people" did not necessarily indicate a lack of understanding of the jury's role. When defense counsel explained that "those people" were jurors, Llamas replied, "The ones you fucking picked," indicating he understood counsel's role in jury selection. Although defense counsel stated that Llamas had "developed some sort of conspiracy" theory, counsel's statements were nonspecific, and the trial court interpreted Llamas's remarks as evidence of dissatisfaction with counsel, rather than evidence in a belief in a conspiracy or a deteriorating mental state. The court's conclusion was not unreasonable. (See *People v. Welch* (1999) 20 Cal.4th 701, 742 [facts that defendant and his counsel did not agree on which defense to employ, defendant had a paranoid distrust of the judicial system, and stated his counsel was in league with the prosecution, "while suggesting the trial court *could have* ordered a hearing on competence to stand trial, do not establish that the trial court *abused its discretion* in failing to do so"].) "[A] reviewing court generally gives great deference to a trial court's decision whether to hold a competency hearing. . . . ' "An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper." ' [Citations.]" (*People v. Marshall* (1997) 15 Cal.4th 1, 33.)

*People v. Murdoch*, *supra*, 194 Cal.App.4th 230, cited by Llamas, is distinguishable. In *Murdoch*, two doctors appointed to evaluate the defendant found he suffered from a severe mental illness, but was competent when taking his prescribed medications. However, he had been refusing to take his medications. Both doctors opined that if he continued to refuse medication, he could become incompetent. (*Id*. at p. 233.) The trial court found him competent, reinstated criminal proceedings, and two months later granted his self-representation request. Prior to opening statements, Murdoch told the court his defense to felony assault charges was that the victim and a witness were not human, but were angelic beings. (*Id*. at pp. 233-234.) Because such beings lacked shoulder blades, he explained, he planned to ask them to shrug at trial to

11

demonstrate their true nature. (*Id*. at p. 234) On cross-examination, Murdoch asked the victim a single question: " 'Can you shrug your shoulders like this?' " (*Id.* at p. 235.) Murdoch was convicted. On appeal, *Murdoch* concluded that the trial court erred by failing to conduct a competency hearing. (*Id.* at p. 239.) Standing alone, the defendant's statements about his unusual defense "may not have compelled institution of competency proceedings." (*Id.* at p. 236.) However, this evidence, when coupled with the psychiatric reports indicating his competence was "fragile," that he had stopped taking his medication, and that he might decompensate if unmedicated, "provide[d] the substantial evidence necessary to demonstrate a reasonable doubt as to whether he had in fact decompensated and become incompetent as the experts had warned." (*Id.* at pp. 236-238.) Here, in contrast to *Murdoch,* there was no evidence Llamas had ceased taking medication, resulting in his decompensation, nor did Llamas display the kind of wildly delusional thinking that demonstrated Murdoch's loss of competence.

2. *Sufficiency of the evidence to prove grand theft.*

The jury found Llamas guilty of grand theft (§ 487) in count 3, for the theft of Ryder's bicycle. The jury was instructed that Llamas "committed grand theft if he stole property worth more than $400."

Prior to January 1, 2011, section 487, subdivision (a) provided that a defendant committed grand theft if he or she stole property worth more than $400. (See Stats. 2009-2010 (2010 3d Ex. Sess.) ch. 28, § 17.) Effective January 1, 2011, after the date Llamas committed the offenses, the Legislature amended section 487, subdivision (a) to define grand theft as the taking of property worth more than $950. (Stats. 2010 (2010 Reg. Sess.) ch. 693, § 1; *People v. Wade* (2012) 204 Cal.App.4th 1142, 1150.) The People concede that the amendment should be applied retroactively to Llamas. The concession is appropriate. The Legislature may amend a criminal statute to diminish punishment when, in its judgment, a lesser penalty "is sufficient to meet the legitimate ends of the criminal law." (*In re Estrada* (1965) 63 Cal.2d 740, 745.) There is a "reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*People v. Brown* (2012)

12

54 Cal.4th 314, 324.) Absent indicia of a contrary legislative intent, courts retroactively apply amendments that reduce punishment. (*People v. Nasalga* (1996) 12 Cal.4th 784, 793.)

Applying these principles, *Wade* concluded the amendment to section 487 should be applied retroactively. *Wade* explained: " '[W]here the amendatory statute mitigates punishment and there is no saving clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed.' " (*People v. Wade*, *supra*, 204 Cal.App.4th at p. 1151.) Moreover, retroactive application is consistent with the Legislature's intent to save the Department of Corrections money by adjusting property crimes for inflation. (*Ibid.*) *Wade* therefore concluded the amendment applied retroactively. (*Id.* at p. 1152.) We agree with *Wade*'s analysis and adopt it here.

Because the jury was misinstructed that theft of items over $400 constituted grand theft, Llamas's conviction on count 3 cannot stand. (See § 1157 [trier of fact must determine the degree of the crime]; *People v. Love* (2008) 166 Cal.App.4th 1292, 1300-1301.) The People argue that the matter should be remanded to the trial court to give them the opportunity to retry the charge if the prosecutor so elects. (See *People v. Wade, supra,* 204 Cal.App.4th at p. 1153, fn. 5 [because there was sufficient evidence to establish grand theft on a valid theory, the People were entitled to retry the defendant]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2 [where amendment to statute to add additional element to an offense was applied retroactively to the defendant, allowing the prosecution an opportunity to establish the additional element on remand was not barred by the double jeopardy clause or ex post facto principles].) Llamas contends that retrial on the grand theft charge is prohibited because the People's evidence was insufficient to prove the property value was over $950. He urges that instead, the conviction should be reduced to petty theft. (See § 1260; *People v. Navarro* (2007) 40 Cal.4th 668, 677-678; *People v. Simpson* (1938) 26 Cal.App.2d 223, 229-230.)

First, even if the evidence was insufficient, that fact would not necessarily bar remand for retrial. "Where . . . evidence is not introduced at trial because the law at that time would have rendered it irrelevant, the remand to prove that element is proper and the

reviewing court does not treat the issue as one of sufficiency of the evidence." (*People v. Figueroa, supra,* 20 Cal.App.4th at p. 72.) In any event, the record discloses that sufficient, though not necessarily dispositive, evidence was presented on the issue. When determining whether the evidence was sufficient, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Carrington* (2009) 47 Cal.4th 145, 186-187.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.)

To determine the value of stolen property for purposes of section 487, "the reasonable and fair market value shall be the test." (§ 484, subd. (a); CALCRIM No. 1801.) The fair market value is generally the price the item would bring in an open market between a willing buyer and seller. (*People v. Pena* (1977) 68 Cal.App.3d 100, 102-104.) "Put another way, 'fair market value' means the highest price obtainable in the market place rather than the lowest price or the average price." (*Id.* at p. 104.) The value of a stolen item is measured at the time and place of its theft. (*Id.* at p. 102, fn. 1; CALCRIM No. 1801.) An item's owner is competent to testify to its value. (Evid. Code, § 813, subd. (a)(1); *People v. Coleman* (1963) 222 Cal.App.2d 358, 361.)

Here, Ryder, the owner of the bicycle—a red Trek 7.6 FX hybrid—testified that he purchased it from a friend in December 2009 for $450. The friend was "looking to upgrade his current bike and buy a new one. So he gave [Ryder] a good deal . . . ." The prosecutor asked Ryder if he had determined what the value of the bike was at the time of purchase. Ryder explained he had researched the value through "[o]n-line pricing and going to various bike stores." Based on his research, the bike was worth between $1,000 and $1,300. This evidence was sufficient to prove the value of the bicycle exceeded $950. Ryder, the owner, was competent to testify on the subject, and explained the basis for his valuation.

Llamas complains that because Ryder purchased the bicycle for $450, the fair market value must have been $450.  Not so.  As *Pena* explained, "If some stores would underprice the items or would give them away that would not be representative of the fair market value."  (*People v. Pena, supra,* 68 Cal.App.3d at p. 103.)  Ryder testified that his friend gave him a "good deal" on the bike, and his research disclosed it was actually worth much more.  From this, the trier of fact could have concluded the highest price obtainable in the marketplace was much more than the low price offered by Ryder's friend.  (*Id.* at p. 104 [market value is the highest price obtainable in the market, not the lowest price].)  Llamas also urges that the bicycle's value must have decreased during the five months Ryder possessed it.  There is no evidence in the record establishing this point, and we do not think it is a foregone conclusion, especially given the relatively short time between the purchase and the theft.  Llamas's complaint that it was unclear whether Ryder's testimony pertained to a new or used bicycle is likewise unavailing.  Ryder testified that the value of "the bike" stolen was between $1,000 and $1,300.  As "the bike" in question was Ryder's friend's used bike, there is no basis to presume, as a matter of law, that Ryder's testimony pertained to a new, rather than a used, bicycle.

## DISPOSITION

The judgment on count 3, grand theft, is reversed and the matter remanded for further proceedings consistent with the opinions expressed herein.  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

CROSKEY, Acting P.J.

KITCHING, J.

16