Filed 12/13/13  P. v. Parker CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DEWAYNE KEITH PARKER,<br><br>    Defendant and Appellant. | F064995<br><br>(Super. Ct. No. F10906004)<br><br>**OPINION** |

## THE COURT*

APPEAL from a judgment of the Superior Court of Fresno County.  Edward O. Sarkisian, Jr., Judge.

Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*       Before Kane, Acting P.J., Poochigian, J. and Detjen, J.

Defendant Dewayne Keith Parker pled no contest to gross vehicular manslaughter and corporal injury to a spouse or cohabitant and admitted having served prior prison terms. On appeal, defendant contends (1) the trial court erred in not holding a competency hearing when there was substantial evidence giving rise to a reasonable doubt regarding defendant's competence and (2) the trial court erred in calculating defendant's conduct credits. We will order the abstract of judgment corrected and affirm the judgment as modified.

## FACTUAL[1] AND PROCEDURAL SUMMARY

On October 28, 2010, defendant and his ex-wife were arguing in their parked vehicle after midnight. Defendant hit his ex-wife, then choked her until she blacked out. When she regained consciousness, she was in the back seat and defendant was driving too fast for her to jump out safely. As the vehicle slowed, she jumped out. Defendant got out, but then drove away. While he sped around Fresno, he hit and killed a pedestrian.

On December 16, 2010, the Fresno County District Attorney charged defendant with vehicular manslaughter with gross negligence (Pen. Code, § 192, subd.(c)(1);[2] count 1); corporal injury to a spouse or cohabitant (§ 273.5, subd. (a); count 2); false imprisonment by violence (§ 236; count 3); kidnapping (§ 207, subd. (a); count 4); assault by force likely to produce great bodily injury (§ 245, former subd. (a)(1); count 5); unlawful driving or taking of a vehicle (Veh. Code, § 10851, subd. (a); count 6); and leaving the scene of an accident resulting in death or great bodily injury (Veh. Code, § 20001, subd. (a); count 7). The information ultimately alleged that defendant had served four prior prison terms (§ 667.5, subd. (b)).

---

[1] The facts are taken from the preliminary hearing.

[2] All statutory references are to the Penal Code unless otherwise noted.

On February 14, 2011, defendant raised a *Marsden*[3] motion for new counsel. Judge Ikeda held a *Marsden* hearing, but stated that an issue had superceded it because defense counsel, Mr. Siegel, had expressed a doubt as to defendant's competence. The court suspended criminal proceedings and instituted proceedings pursuant to section 1368. Two doctors were appointed to examine defendant.

The next day, Judge Ikeda entertained the *Marsden* motion again, concluding there had been an irremediable breakdown in communication between defendant and counsel. The court relieved Mr. Siegel and appointed new counsel.

On March 11, 2011, Dr. Taylor reported that defendant was competent. He refused to answer most questions, and "[w]hen he did speak[,] he offered tangential and angry responses to questions that all had to do with either cursing at 'the bitch' or wanting to get out of jail. His verbalizations reflected an individual with a limited education and cognitive ability. His mood and affect were angry." Dr. Taylor concluded that if defendant chose to do so, he had the capacity to understand the nature of the criminal proceeding and was able to assist counsel in the conduct of his defense in a rational manner. Dr. Taylor found no evidence that defendant was experiencing symptoms of any major mental illness and was instead of the opinion that defendant's uncooperative and hostile presentation was primarily the product of an attempt to portray himself as mentally impaired in an effort to avoid criminal responsibility. Jail staff reported that in defendant's daily interactions, he was conversant, rational, and engaging. Dr. Taylor believed defendant was malingering.

On April 5, 2011, Dr. Seymour concluded defendant was competent despite his refusal to answer any questions. He sat calmly and stared at the floor. Dr. Seymour reported that defendant's refusal to respond appeared to be "nothing more than an attempt to manipulate through non-cooperation." Nothing suggested current or historical major

---

**3** *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

3.

mental disorders. Prior episodes of past aggression and agitation were easily understood in the context of substance abuse. Jail staff reported unremarkable behavior. Dr. Seymour stated that defendant might continue to present with passive resistance, but this was a choice, not the result of mental illness. Dr. Seymour believed defendant was malingering.

On April 18, 2011, a competency hearing was held before Judge Ikeda. Defendant appeared with new defense counsel, Mr. Dinakar. The court considered the reports by Dr. Taylor and Dr. Seymour, found defendant competent, and reinstated criminal proceedings.

On May 27, 2011, defendant made another *Marsden* motion before Judge Ikeda. During the *Marsden* hearing, Mr. Dinakar expressed a doubt as to defendant's competence. Counsel explained that one previous psychological report stated defendant was malingering and the other stated defendant had refused to answer any questions. And counsel was having problems communicating with defendant. Ultimately, defendant explained to the court that he wished to represent himself and the *Marsden* hearing was concluded.

Judge Ikeda and both counsel conferred privately, after which Judge Ikeda stated:

> "We're back on the record in [defendant's case]. And the Court was conferring with counsel as to counsel's statement that [defendant] may not be competent to stand trial. I did have a chance to review Dr. Taylor and Dr. Seymour's reports. I am concerned about whether [defendant] is in fact competent to stand trial. He was not very cooperative and in some ways non-communicative in the process so I'm not sure how much of a basis the psychologist had to arrive at an opinion as to defendant's competency, in particular the description of the questions and answers in Dr. Taylor's report makes me question defendant's competence and also his mental ability and ability to make a knowing waiver of his right to counsel. I think it would be a disaster for [defendant] to try to represent himself. [¶] At this point I'm willing to hear more from [defendant] and the attorneys. My feeling is that since we've already had two psychologists say that the defendant is competent, even if we got a third opinion saying that he is incompetent, we still have the question what to do with all that material.

4.

And I guess just from the numbers—not necessarily the quality, but the numbers—that would suggest the Court would still be in a position to find him competent, so I don't think there's a lot gained by doing that. [¶] On the other hand, I feel that the Court can take all of this into consideration in making a determination that [defendant] is not able to make a knowing waiver of his right to counsel and to leave counsel in place and keep the trial proceeding. I'm guided in part by my view that [defendant's] current counsel will be in a much better position to get a fair result [for defendant] than if [defendant] were to try to represent himself. I think it would be a total zoo. Based upon his responses to Dr. Seymour's questions I don't see how he would have any ability to take this case forward, and also considering the answers to his [*People v. Faretta* (1975) 422 U.S. 806 (*Faretta*)] questionnaire."

Defendant asked the court if this was a competence hearing. The court said it was not, but that the court was "leaning towards finding [him] competent to stand trial but not being able to make a knowing waiver of [his] right to counsel." The following occurred:

"THE DEFENDANT: Wasn't criminal proceedings presumed [*sic*]? [¶] … [¶] I mean, for [counsel] to say that I'm incompetent now based on I'm trying to seek new counsel or support—

"THE COURT: No, I don't think—that wasn't your intention, was it, counsel?

"MR. DINAKAR: No, it wasn't, your Honor.

"THE DEFENDANT: Why wasn't it?

"THE COURT: He's not saying you're incompetent because you're objecting to him.

"THE DEFENDANT: He just said on record, before you all left he said, [']I feel that he's incompetent to stand trial.[']

"THE COURT: That's correct, he did say that.

"THE DEFENDANT: And you obliged that statement.

"THE COURT: Well, that's why I conferred to figure out how that impacted the proceeding.

"THE DEFENDANT:  Then you, the D.A. and my attorney went to the office and talked about this.  You came back with statements that's [sic] reflecting my competency right now, and this is not a competency hearing.

"THE COURT:  Well, it is in the sense that when your attorney expresses a doubt as to your competency to stand trial, then the Court has some obligation to consider whether to appoint mental health—

"THE DEFENDANT:  Your Honor, you're the same judge that heard the competency hearing and you said that I was competent to stand trial.  You made a ruling that said that I was competent to stand trial.

"THE COURT:  Yes.  And I'm—as I said, I'm inclined to leave that ruling in place and find you competent to stand trial.

"THE DEFENDANT:  Well, if I'm competent to stand trial, why I'm not competent to defend myself when I'm seeing that my—I just expressed—I just expressed that my attorney came to see me two times and the two times he didn't have my file and he didn't—you know what I'm saying, and he expressed that he—he only seen me two times, and he never once was ready to go to trial or—  [¶] … [¶]

"THE COURT:  Okay.  Well, let's go ahead and take up the issue as to the *Faretta* motion.  Is everything you've written in this questionnaire true and correct?

"THE DEFENDANT:  Yes."  (Italics added.)

At this point, defendant explained in response to the court's questions that he had graduated from high school, had not completed college, had run a halfway home for about five years, and had helped inmates with writs and appeals when he was in prison. He explained that a guilty plea means "self-admitting that you did something."  A felony is more serious than a misdemeanor.  The possible penalties he could face if found guilty were "15 years, possible third strike."  An opening statement was "[t]he first time I speak to the jury."  To voir dire a jury means "[t]o select a jury."  Jury selection comes before opening statements.  A hearsay objection means "it's hearsay, not fact, non-fact."  A bifurcated trial is "to determine a client's or defendant['s] sanity."  He did not know the

meaning of a challenge for cause, a peremptory challenge, a *Wheeler*[4] motion, or a motion in limine. He said he needed to do some more research.

Defendant objected to the court's reliance on Dr. Taylor's report, which noted that defendant had answered the doctor's questions (e.g., whether a felony or a misdemeanor is a more serious offense) with hostile statements having no connection to the questions (e.g., "That sorry ass bitch."). He claimed he did not remember making any of those statements.

When the court asked defendant why he would not be at a disadvantage representing himself, he said, "Oh, because I know my case better than [my] attorney would know it[;] I have arguments that I can pursue better than my attorney would." After further questioning, the court denied defendant's request to represent himself, finding he was not capable of making a knowing waiver of his right to counsel.

Moments later, Mr. Dinakar informed the court he was not ready to proceed to trial. Defendant then asked if he could make a *Marsden* motion. The court heard the motion, granted it due to a breakdown in attorney-client relationship, and appointed new counsel.

On June 23, 2011, new defense counsel, Mr. Lindahl, asked Judge Ikeda to reconsider and grant defendant's *Faretta* motion to represent himself. Mr. Lindahl said he had spoken with defendant and was confident he had the ability to represent himself. The court explained that it had done a fairly extensive review and had doubts as to defendant's ability to enter into an intelligent waiver, so the court was not inclined to change its mind, but it set a hearing.

On July 8, 2011, defendant appeared with Mr. Lindahl before Judge Vogt. Mr. Lindahl said he had received the transcript of the *Faretta* motion hearing. Then he stated: "Now, my understanding from the way this case proceeded before I came into it

---

**4**     *People v. Wheeler* (1978) 22 Cal.3d 258.

7.

was that there had already been a 1368 and a finding; is that what the Court's file reflects?  [¶] … [¶]  All right.  If that is the case, your Honor, I am now raising a doubt pursuant to 1368.  I would ask that doctors be appointed."  The court responded:  "Okay.  Based on counsel's representations, then, the Court will suspend criminal proceedings pursuant to Penal Code Section 1368."  Judge Vogt appointed two more doctors to examine defendant.

On October 24, 2011, Dr. Geiger reported she could not make a conclusion regarding defendant's competence because defendant chose not to speak to her.  He sat calmly and looked at his pant legs.  He remained "selectively mute," noncompliant, angry, and hostile.  When Dr. Geiger got up to leave, however, defendant fixed his gaze on her.  Jail staff reported defendant was cooperative, logical, coherent, and understandable.  Dr. Geiger concluded that defendant had chosen not to cooperate and was "functioning in a volitional fashion to limit his functioning," "selectively avoiding the court proceedings."  He showed no overt symptoms of psychosis.  Dr. Geiger believed there was a "lower probability" that he was incompetent to stand trial due to a major mental disorder.

On November 1, 2011, Dr. Kendall reported that defendant was unwilling to cooperate with the examination.  Defendant had told his escorting officer he agreed to the examination, but he refused to speak to Dr. Kendall.  When Dr. Kendall asked defendant why he told the escorting officer he would speak with him if he had no intention of doing so, defendant smiled at him and continued to remain silent.  Dr. Kendall saw no display of psychosis, bizarre behavior, affective instability, or cognitive impairments, but he could not provide the court a psychological evaluation.

On December 12, 2011, a competency hearing was held before Judge Harrell.  The parties stipulated that the court could consider the doctors' reports from the prior competency hearing as well as the present one.

8.

The court read and considered the reports, noting that the two prior reports were still quite recent and thus appropriate for the court to consider them. The court found that the defense had failed to meet its burden of showing defendant was not competent to assist counsel during the course of any trial on this case. Based on these reports, Judge Harrell found defendant competent to stand trial and reinstated criminal proceedings.

At this point, defendant renewed his *Faretta* motion to represent himself. The court questioned him, was satisfied that he knowingly waived his right to counsel, and granted his request to represent himself.

On January 5, 2012, Judge Ikeda granted defendant's request to withdraw his *Faretta* motion and reappoint Mr. Lindahl.

On February 2, 2012, defendant made another *Faretta* motion before Judge Ikeda. The court stated it had been reviewing a new case, *People v. Johnson* (2012) 53 Cal.4th 519 (*Johnson*), which held that, "[c]onsistent with long-established California law, … trial courts may deny self-representation in those cases where [*Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*)] permits such denial." (*Id.* at p. 528.) *Edwards* held that "the Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial … but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Edwards, supra,* at pp. 177-178.) The court referred to defendants who are competent to stand trial but not to represent themselves "gray-area defendants." (*Id.* at p. 174.)

Judge Ikeda reflected on defendant's interview with Dr. Taylor, during which defendant gave inappropriate responses unrelated to Dr. Taylor's questions, and a letter defendant wrote to Judge Ikeda on May 3, 2011, which Judge Ikeda described as

9.

incoherent. The court stated it had a substantial doubt that defendant was really able to represent himself under *Edwards* and *Johnson*, cited above.

Then the following occurred:

> "[MR. LINDAHL:] … I can tell the Court, when I speak with [defendant] I have different impressions at different times. On one day I think he would do very well to represent himself. He seems to speak well, he seems to present well. On another day it's 180 degrees. Some days I think he's more competent than some lawyers I know. I just don't know what days those are.
>
> "THE COURT: All right. Are you expressing a doubt as to his competency to stand trial at this time, the lower standard?
>
> "MR. LINDAHL: Your Honor, I'm not. I am not. I believe there's a difficulty in communication, but I don't think at this point it rises to the level of incompetence. I don't think so.
>
> "THE COURT: Okay. All right, [defendant], thank you for patiently waiting for your turn. I know you have thoughts you want to express, so this is your opportunity. You may speak.
>
> "THE DEFENDANT: I request to represent myself at this time.
>
> "THE COURT: Okay. Anything else you would like to say.
>
> "THE DEFENDANT: (Shakes head.)
>
> "THE COURT: All right. Well, the Court feels more instructed on its role having read this new decision, and based on that, the Court finds that defendant has shown disorganized thinking at times, shows deficits in sustaining attention and concentration, his expressive abilities are on and off. Apparently sometimes he's totally non-communicative, at least with healthcare professionals. At other times, when he does express himself it's totally unrelated to the question being asked. I believe his abilities to represent himself are significantly impaired based upon the evaluation submitted and also [defendant's] own comments and demeanor in court. I do appreciate he is calm and respectful today. Can't say that's always been the case. The request for self representation is denied."

On March 26, 2012, trial was set to proceed before Judge Sarkisian, but Mr. Lindahl informed the court that defendant wished to make a *Faretta* motion. The following occurred:

"MR. LINDAHL: Your Honor, there is a—my client did make a *Faretta* request in the presiding department. Presiding had indicated that it would defer the issue to the trial court. Other than that—how—um—I—I do have a concern, Your Honor, pursuant to 1368. Um—there have been previous 1368 requests by other Counsel and myself. It's not at the point where I have a concern yet, but it's getting close to that point. I just wanted to make the Court aware.

"THE COURT: Well, I did briefly review the file before I took the bench. I haven't studied every document in the file, but I have reviewed the file briefly and noted that there have been previous 1368 proceedings and previous *Faretta* issues raised and ruled upon by the Court.

"So in terms of the *Faretta* issue that was addressed this morning in the Presiding Judge's department, at this point is that still before the Court? I'll give you some time to confer with [defendant], but I just wanted to determine if that's still before the Court at this time.

"MR. LINDAHL: Your Honor, at this point frankly I have a concern pursuant to 1368. I would ask that proceedings be suspended.

"THE COURT: So by your statement you're declaring a doubt as to Defendant's competency; is that correct?

"MR. LINDAHL: I am, yes.

"THE COURT: Well, there have been previous 1368s, and I haven't read those reports. And perhaps it might be appropriate to review the file once again before I act on your request. [¶] But before I take further action, Mr. [Prosecutor], the People wish to be heard?

"[PROSECUTOR]: We're ready for trial, Judge. And we obviously object to a 1368, at least without something on the record from the Defense. That's all. [¶] … [¶]

"MR. LINDAHL: … And it is not my custom or practice to ask for 1368s. But in this particular case, though I've spent a great deal of time speaking with [defendant], I do have a serious concern. Obviously I am a professional, but I'm a lawyer, I'm not a psychiatrist, I'm not a

11.

psychologist, I'm not a doctor.  But what I hear gives me concern, something along the lines of a serious obsessive compulsive disorder to the point where it does cause me a concern.  And I'm not raising the issue—I recognize where we are procedurally in the case.  But this is a concern that I've had consistently with this Defendant, Your Honor.  I want to represent [defendant].  I want [defendant] to be able to assist counsel in the proceedings.  And I have a serious concern.

"THE COURT:  When you declared the previous doubt, 1368, were any—was a further basis set forth in terms of why the motion was being made in terms of specifics that I think Mr. [Prosecutor] was requesting be made this morning?  [¶] … [¶]

"MR. LINDAHL:  [M]y biggest concern has to do with a puzzling inability—an apparent puzzling inability of the Defendant to grasp the way the particular proceedings flow.  I don't think—frankly, I don't think it's because [defendant] is unintelligent.  I think [defendant] is intelligent.  And I am concerned there are some mental health issues overlaying that.  [Defendant] is highly intelligent, but perhaps to the point of information overload as it were.  Like I said, I can't give any kind of diagnosis, I just— and frankly he has been examined previously.  And my concern is that at least in one instance the examining doctor was unable to form an opinion, and it may have been because masking or guarding of symptoms by—by the Defendant.  And it causes me—has caused and continues to cause me a great deal of concern." (Italics added.)

The parties agreed to allow the court to review the doctors' reports.  Following that review, the court denied the motion, stating:

"[THE COURT:]  And before the Court goes any further, is there anything further you wish to state for the record, Mr. Lindahl?

"MR. LINDAHL:  Only that I—that I have a serious concern regarding [defendant's] competence, Your Honor.  I don't think that—I would ask if the Court were to suspend proceedings that the doctors speak with jail staff for their input regarding the question at hand.  [¶] … [¶]

"THE COURT:  All right.  Well, let me state the following regarding the Court's view as to the motion presented:  [¶]  Upon declaration of a doubt previously pursuant to Penal Code Section 1368 four[] doctors have attempted to speak to and evaluate the Defendant.

"Dr. Kendall, by that report dated November the 1st, 2011, there was no evaluation or opinion rendered by Dr. Kendall in light of Defendant's

12.

refusal to speak to the doctor.  [¶]  Dr. Geiger, whose report[] dated October the 24th reflected Defendant was uncooperative and likewise rendered no opinion.  [¶]  Dr. Seymour, whose report dated April the 5th, Defendant refused to speak to.  And Dr. Seymour concluded the Defendant was malingering, but nevertheless reported that he opined the Defendant was competent.  [¶]  And Dr. Taylor, whose report dated March the 11th, was presented to the Court, similarly opining that the Defendant was malingering.  And [Dr. Taylor] opined that Defendant was competent to stand trial.

"So in light of those four reports, and the ultimate determination by Judge Harrell that Defendant was competent to stand trial, we have those reports and that finding before us.  [¶]  And, Counsel, in doing some research on this issue relating to a renewed 1368, there are cases to the following effect:

"'That once a competency hearing has been held, and a Defendant has been found competent to stand trial, the trial court is obliged to initiate a second incompetency hearing only when it is presented with a substantial change of circumstances, or with new evidence casting serious doubt on the finding that the Defendant was competent.'  [¶] … [¶]

"So it seems to me, Counsel, in light of the previous reports filed by … all [the] doctors, and the finding of competence, I'm not satisfied at this point that as these cases reflect that a substantial change of circumstances, or there being new evidence casting serious doubt on the finding that the Defendant was competent.  So in light of that, I'm not inclined, Mr. Lindahl, at this point to further suspend criminal proceedings, unless that requisite basis that these cases seem to call for is present.  [¶]  And it seems to me that if the Court did declare a doubt based on the state of the record at this time, this morning, we would again merely be referring the Defendant to doctors again for him not to speak, and to again doctors either opining that he was either competent or that he was malingering.  In fact, I think [in] one of the reports one of the doctors did consider in the setting at the jail, and I believe one of the doctors did speak to some individuals at the jail consistent with your request, Mr. Lindahl.  So it seems to me that at this point the Court is not inclined to suspend[] criminal proceedings based on the state of the record at this—at this moment."

Following the lunch recess, the court addressed defendant's *Faretta* motion, explaining *Johnson, supra,* 53 Cal.4th 519, and the difference between competence to stand trial and competence to represent oneself.  Then the following occurred:

13.

"[THE COURT:]  And there is also a portion of that opinion that deals with the Court appointing a psychologist or psychiatrist to inquire into the specific question about one's mental competence, the defendant's mental competence, relating to the specific question of self-representation. Not 1368, but competence relating to self-representation.  [¶] … [¶]  And, [defendant], previously you declined to speak to all of the other psychologists or doctors in this case; is that correct?

"DEFENDANT:  Yes.

"THE COURT:  Why?

"DEFENDANT:  I have—I didn't have any control of [the] situation at the time.  I mean, they sent—I didn't want to see them at the time, you know.  I know it was all competency issue, but you know it was not something I wanted to participate in, so I had fun with it.

"When I did, you know, they was going to hear what—I didn't want to speak with them.  I didn't request to speak with them.  And I thought it was appropriate if I didn't speak with them.  And it was one time where I just got tired, you know, of seeing these people.  Just because my attorney don't want to listen to what I—don't want to listen to anything I want them to do, which is why I'm requesting this [self-representation].

"THE COURT:  Well, one thing that I have [a] serious question about is whether or not you're competent to represent yourself and whether or not you have the discovery and everything else that one needs in order to represent yourself.  And I have some very serious doubts about your competency to represent yourself.  That specific question.  [¶] … [¶]  Like I said, I have serious doubts that you're ready to proceed.  If you want to represent yourself you have to have all the discovery, you have to have time to file all the reports, you have to be mentally competent to represent yourself.  And I think by going to trial today and saying you're representing yourself now, will not do you or the case any service.  [¶] … [¶]

"Let me ask you this, you refused to speak to the other doctors that were appointed to examine you for 1368 purposes.  If I appoint a doctor to examine you to see if you're competent to represent yourself[,] would you speak to that doctor?

"DEFENDANT:  In relevance of you allowing me to go pro per?

"THE COURT:  Let me repeat the question.

"DEFENDANT:  I heard what you said.

14.

"THE COURT: I want to understand—

"DEFENDANT: I'm trying to figure out how this is going to end. This is like a tit for tat endeavor. If you do this[,] I'll grant you. Is that how this particular proceeding work [*sic*]?

"THE COURT: Let me ask my question again. If I appointed a doctor to examine you to see if you're competent to represent yourself[,] would you speak to that doctor?

"DEFENDANT: In essence that you going to allow me to represent—

"THE COURT: I'm not saying what I'm going to do. I'm trying to work through this entire issue. I don't know what I'm going to do yet. I'm trying to conduct the best inquiry I can to make a very important decision.

"[I'll r]epeat the question and take your time to think about it. If I appoint a doctor, like the Supreme Court said in this *Johnson* case, in fact the defendant in the *Johnson* case refused to speak to that doctor. [¶] If I appointed a doctor to see if you're competent to represent yourself[,] could you speak to that doctor? Take your time and think about it.

"DEFENDANT: No.

"THE COURT: Your answer is no?

"DEFENDANT: I don't believe I will. No, no.

"THE COURT: All right. I have also reviewed the previous *Faretta* questionnaire that was submitted by the defendant on May the 26th , 2011, and read and considered that as well. [¶] And at this point the Court is going to deny the defendant's request to represent himself. Namely, again, to go back in pro per status. [¶] Again, I harken back to the timeliness of the request made this morning, the prior proclivity to substitute counsel and, in essence, the entire procedural history of this point leading up to this date. I'm not satisfied the defendant also can adequately represent himself. And I think that this is a situation that requires that he be assisted by the guiding hand of counsel. [¶] And I come back to the timeliness of the request, prior proclivity to substitute counsel, the prior self-representation that was withdrawn, and all the facts and circumstances." (Italics added.)

With that explanation, the court denied defendant's *Faretta* motion.

The next day, defendant entered into a plea deal and pled no contest to counts 1 and 3 and admitted three prior prison terms.  The trial court sentenced him to eight years in prison and awarded credit for 491 actual days and 73 conduct days, for a total of 564 days of presentence custody credit.

## DISCUSSION

### I.     Failure to Hold Competency Hearing

Defendant contends Judge Sarkisian erred on March 26, 2012, by failing to hold a third competency hearing in light of substantial evidence giving rise to a reasonable doubt about defendant's competence.  We see no abuse of discretion.

#### A.     *Law*

Both the due process clause of the Fourteenth Amendment and state law prohibit the trial of a criminal defendant while he is mentally incompetent.  (*People v. Elliott* (2012) 53 Cal.4th 535, 582; *People v. Lewis* (2008) 43 Cal.4th 415, 524 (*Lewis*); *People v. Murdoch* (2011) 194 Cal.App.4th 230, 236 (*Murdoch*); § 1367, subd. (a).)  A defendant is deemed competent if he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, and has the mental capacity to understand the nature and purpose of the proceedings against him.  (*People v. Ary* (2011) 51 Cal.4th 510, 517 (*Ary*); *People v. Blair* (2005) 36 Cal.4th 686, 711 (*Blair*); § 1367, subd. (a).)  A defendant is presumed competent unless it is proved otherwise by a preponderance of the evidence.  (*People v. Ramos* (2004) 34 Cal.4th 494, 507 (*Ramos*); *Ary,* at p. 518; § 1369, subd. (f).)  The defendant has the burden of establishing lack of competence.  (*Ary,* at p. 518)

A trial judge must "suspend proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial.  [Citations.]"  (*Blair, supra,* 36 Cal.4th at p. 711; § 1368, subd. (a); *Ary, supra,* 51 Cal.4th at p. 517; *Ramos, supra,* 34 Cal.4th at p. 507; *Murdoch,*

16.

*supra,* 194 Cal.App.4th at p. 236.) "Our statutes provide for suspension of criminal proceedings when a doubt as to the defendant's competence arises in the trial judge's mind or when counsel informs the court of counsel's belief the defendant may be incompetent (§ 1368); the appointment of psychologists or psychiatrists to examine the defendant (§ 1369, subd. (a)); and trial of the issue to a jury or to the court (*id.,* subds. (b)-(f)). The defense may waive a jury trial and may even … submit the issue to the court on the written reports of psychologists or psychiatrists. [Citations.]" (*People v. Taylor* (2009) 47 Cal.4th 850, 861-862.) The court's duty to conduct a competency hearing may arise at any time prior to judgment. (*People v. Rogers* (2006) 39 Cal.4th 826, 847 (*Rogers*)).

Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. To be entitled to a competency hearing, a defendant must exhibit more than a preexisting psychiatric condition that has little bearing on the question of whether he can assist his defense counsel. (*Rogers, supra,* 39 Cal.4th at p. 847.) Counsel's opinion that the defendant is incompetent, although entitled to some weight, does not compel the court to order a competency hearing. (*Lewis, supra,* 43 Cal.4th at p. 525; *Blair, supra,* 36 Cal.4th at p. 719; *People v. Panah* (2005) 35 Cal.4th 395, 433.)

"'"'When a competency hearing has already been held and defendant has been found competent to stand trial, … a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding. [Citations.]'"'" (*People v. Taylor, supra,* 47 Cal.4th at p. 864; *People v. Kelly* (1992) 1 Cal.4th 495, 542; *People v. Lawley* (2002) 27 Cal.4th 102, 136.) When sufficient evidence is not produced, the trial court does not abuse its discretion by not holding an additional competency hearing. (*People v. Welch* (1999) 20 Cal.4th 701, 742.)

### B.      Analysis

Defendant argues that defense counsel's comments on March 26, 2012, were sufficient to cast a doubt on his competence because counsel referred to "something along the lines of a serious obsessive compulsive disorder" and his "puzzling inability … to grasp the way the particular proceedings flow." Counsel explained that he was concerned that the doctors may have been unable to form an opinion about defendant because he was masking or guarding symptoms of a mental disorder. At this point, Judge Sarkisian asked whether the parties had any objection to his reviewing the doctors' reports, and both parties stated they did not.[5]

We do not believe the concerns defense counsel mentioned on March 26, 2012, were evidence of a substantial change in circumstances that cast a doubt on the two previous findings of competence. Defense counsel, who had on previous occasions stated his ongoing concerns about defendant's competence, pointed to nothing specific that demonstrated a change in defendant's behavior or abilities. And although Judge Sarkisian did not preside over the previous hearings, the record reflects that defendant was actively engaged in the court proceedings. He was aware of his rights to counsel and to represent himself, and he repeatedly moved to assert those rights. The record demonstrates he was capable of arguing before the court with at least moderate coherence and was described by his counsel as "highly intelligent." In fact, on the morning of March 26, 2012, defendant again raised a *Faretta* motion, which the court addressed after the competency issue.

Defendant stresses that Judge Sarkisian revealed his own concern for defendant's competence during the *Faretta* hearing only a few hours after he declined to hold a competency hearing. But, as was explained at trial more than once, competence to

---

**5**      This lack of objection disposes of defendant's complaint that the court improperly relied on the "outdated" reports.

represent oneself is different than competence to stand trial. The fact that defendant's thoughts were disorganized, his concentration limited, or his demeanor inappropriate did not necessarily demonstrate defendant was incompetent to stand trial.

Notably, at that *Faretta* hearing, defendant himself showed that he understood the nature and purpose of the proceedings. He told the court he had chosen not to speak to the doctors because "it was not something [he] wanted to participate in, so [he] had fun with it." This admission confirmed the doctors' conclusion that his failure to participate in the examinations was not due to a mental disorder, but was instead part of a strategy to appear mentally unfit and toy with the court proceedings; it established that defendant understood the process and chose to manipulate it, thereby confirming the doctors' findings of deception and competence; and it answered defense counsel's concern that defendant might have been masking or guarding symptoms of a mental disorder during those silent examinations.

In sum, on March 26, 2012, there was no evidence that defendant's mental status had deteriorated or that his ability to participate in and assist with his defense had changed such that the trial court should have doubted the validity of the prior findings of competence. The trial court did not abuse its discretion when it decided not to hold a third competency hearing.

## II.    Conduct Credits

The error in calculation of the number of credits pointed out by defendant has been corrected by the trial court, but defendant notes that the amended abstract still checks a box for section 2933.1 rather than for section 4019. We will order this correction.

## DISPOSITION

The clerk of the trial court is ordered to amend the abstract of judgment by checking the box for section 4019 and unchecking the box for section 2933.1. As so modified, the judgment is affirmed.

19.